(No. 30228. )

ILLINOIS CENTRAL RAILROAD COMPANY *et al.*, Appellees, *vs.* ILLINOIS COMMERCE COMMISSION, Appellant.

*Opinion filed January 22, 1948.*

GEORGE F. BARRETT, Attorney General, of Springfield, (WILLIAM C. WINES, RAYMOND S. SARNOW, and JAMES C. MURRAY, all of Chicago, of counsel,) for appellant.

WILLIAM J. O'BRIEN, JR., of Chicago, (VERNON W. FOSTER, CHARLES A. HELSELL, JOSEPH H. WRIGHT, all

of Chicago, and CRAIG & CRAIG, of Mattoon, of counsel,) for appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

The Illinois Central Railroad Company and the Railway Express Agency, Inc., filed with the Illinois Commerce Commission on August 26, 1945, a petition seeking permission to close the agency station at Allenville, Moultrie County, and make it a prepay station. Evidence was heard and, on June 18, 1946, the commission entered an order denying the relief sought. A petition for rehearing was denied. Upon appeal, the circuit court of Moultrie County set aside the order of the commission and remanded the cause. The Commerce Commission prosecutes this direct appeal, pursuant to section 69 of the Public Utilities Act. Ill. Rev. Stat. 1947, chap. 111⅔, par. 73.

By their petition, the railroad company and the express agency alleged that the business, inbound or outbound, at Allenville is not substantial in volume and could be handled by the agency stations at Sullivan, 5.7 miles to the south, and Mattoon 9.6 miles north, without seriously inconveniencing the public; that the cost of conducting business at the present station is disproportionate to the amount of revenue obtained therefrom and the benefit the public derives from its maintenance, and that substitution of a prepay station will effect a material saving in the net revenue of the two companies, and will not discommode the public or interfere with the duties and obligations owing from the carriers to the public.

Allenville, an unincorporated village, contains a population of approximately 250. The station is located on a single track line of what is called the Peoria district of the Illinois Central Railroad. Agency stations are maintained by the railroad company at Sullivan and Mattoon. The distance by State route No. 121 from Allenville to Mattoon is 10.5 miles and to Sullivan 7.5 miles, .9 mile and 1.8

miles, respectively, longer than by rail. Allenville is a farming community. Its business establishments include two grocery stores, one general store, a gasoline station, a garage and a grain elevator. The village is served by a bus line making three stops daily in both directions. The railroad company furnishes freight service, only, at Allenville. Carload shipments are made by rail and less than carload shipments by Illinois Central "over-the-road" truck service. The Decatur Cartage Company serves Allenville, transporting less-than-carload shipments by truck. The proposed plan to make Allenville a prepay instead of an agency station will result in no change in the present train service and the station will be available for use by the public. Less than carload freight will be unloaded at the station and can be picked up by the consignees. Carload freight can be billed from Sullivan or Mattoon where persons desire to ship less than carload, or carload, from Allenville. Bills of lading may be signed by the conductor on the local freight train, the truck driver, or the agent at either Sullivan or Mattoon. Cars may be ordered for loading through any one of these three individuals. Telephone service is available without toll charge from Allenville to Sullivan, and with toll charges from Allenville to Mattoon. Consignees will be notified by either agent by telephone or postal card of the arrival of freight.

Seventy-one carload shipments, both inbound and outbound, were handled at Allenville in 1942; 107 in 1943; 110 in 1944, and 76 in the first eleven months of 1945. Less-than-carload shipments aggregated 44 in 1942, 40 in 1943, 59 in 1940, and 39 for the first eleven months of 1945. During the twelve months prior to the hearing only one less-than-carload shipment was forwarded from Allenville. The principal commodities received in carloads are coal and road oil. Outbound carloads contain grain, principally corn and soy beans. For the years 1942, 1943, 1944, respectively, the railroad's portion of gross revenue from

all business handled at the Allenville station amounted to $8106.16, $11,504.83, and $12,077.11. The first eleven months of 1945 reflect a declining trend, the gross revenue from all sources amounting to $8694.43. These amounts do not take into consideration revenue received for shipments of soy beans to Decatur to be processed and reshipped. Almost the entire amount of revenue arose out of handling freight. Revenue accruing from express service and Western Union business has been nominal. The wages paid the agent at Allenville by the railroad company ranged from $1884.96 in 1942 to $2022.72 for the first eleven months of 1945. Gross revenue derived from all sources was thus approximately four and one-half to six times the amount of wages paid the agent.

The largest single source of revenue is the Sullivan Grain Company which owns the elevator at Allenville. Its superintendent of operation of all elevators testified that the company uses the facilities of the railroad company at both Sullivan and Allenville in shipments of grain. It pays the railroad company $40 to $60 a year in rentals. The farmers do not themselves ship the grain, as they sell it to the Sullivan Grain Company. This company handles all the coal and grain at Allenville. Of the railroad company's total revenue amounting to $12,077.11 for the year 1944, the Sullivan Grain Company traffic produced revenue of $9950.58. Revenue derived from the general public amounted to $2054.40 in freight, $60.42 in express and $11.71 in Western Union business, a total of $2126.53. The amount of gross revenue obtained from shippers other than the Sullivan Grain Company exceeded the wages of $2088.40 paid the local agent by but $38.13. The superintendent testified that the Sullivan Grain Company had no objection to the closing of the agency station at Allenville; that the company operates country grain stations in communities where there are no agents; that if there were no agent present in Allenville, the company would handle

billings out of its office at Sullivan, and, further, that the company now finds it more convenient to bill its loads at Sullivan.

Although the evidence discloses they did not utilize the services of the station agent to any appreciable extent, eight witnesses testified that they would be inconvenienced by discontinuance of the agency station. Of these, two who operate the general store in Allenville testified that they had neither made nor received a carload shipment by freight for several years. The supervisor of Nelson township, a farmer who feeds but does not raise cattle, testified that he had not received, or shipped any cattle at Allenville in the past four years but had received shipments of less-than-carload lots in this period. His carload shipments have been made through the agency at Sullivan. A second farmer received one carload of cattle during the last four years, namely, in 1945. Another farmer testified that he had received cattle in the past year at Sullivan; that cattle were not delivered at, and he did not ship from, Allenville because there were no stock pens, but that he thought he would still ship out of Allenville by rail if stock pens were available. The stock pens at Allenville, it appears, had been removed because but little livestock was unloaded at the pens. A fourth farmer testified that he had not received a carload shipment in the last four years. A township highway commissioner testified that the East Nelson township received fourteen carloads of oil in the previous year; that the proposed change in the station would require him to repair to Sullivan to "take care of my bill and empty the cars out." The postmaster who also operates a small store at Allenville testified that he had received about four shipments of less-than-carload freight and four or five express shipments in the past year. Sixteen citizens of Allenville, by a petition addressed to the railroad company, its officers and directors, requested that the agency station be maintained, representing its closing would be a great

inconvenience to the merchants and residents of Allenville, as well as to the residents of the surrounding territory.

The order of the commission is based upon findings, among others, that the railroad company's business had shown an increase at Allenville for the years 1942, 1943 and 1944; that the carrier had derived a net profit in each of these years; that the only saving to the carrier resulting from changing the agency to a prepay station would be the agent's salary; that the diversified nature of the shipments inbound and outbound shows the public is making a general use of the station, and that removal of the agent and conversion of the station to a prepay station would seriously inconvenience the public.

The circuit court vacated the order of the commission as unreasonable and unlawful for the reasons that the maintenance of an agent at Allenville is uneconomic and inconsistent with the businesslike operation of the railroad; that, considering the character of the proposed service, the evidence fails to disclose any reason of public necessity requiring the continuance of the present service, and that there is no particular convenience accruing to the public in general in continuing the present service in view of the substitute service proposed.

Seeking a reversal, the Commerce Commission maintains the appellees, the railroad company and the express company, failed to prove that public convenience and necessity no longer require the agency at Allenville. Recent decisions of this court have established the rule that it is unreasonable to require the maintenance of an agency station where the cost of the service is out of proportion to the revenue derived from the portion of the public benefited thereby, particularly where a substitute service may be provided affording the same essential, although less convenient, service. (*Atchison, Topeka and Santa Fe Railway Co.* v. *Commerce Com.* 397 Ill. 406; *Illinois Central Railroad Co.* v. *Commerce Com.* 397 Ill. 399, 397 Ill. 387, 397 Ill. 323.)

Among the factors to be considered in determining the question are the volume of business done at the station, its proximity to other stations, the accessibility of the latter, and the cost of furnishing such service. (*Illinois Central Railroad Co. v. Commerce Com.* 375 Ill. 585.) The public convenience and necessity required to be shown as a basis for the Commerce Commission's order are those of the public and not of an individual or number of individuals. (*Illinois Central Railroad Co. v. Commerce Com.* 397 Ill. 399.) "The test to be applied," we noted in the case last cited, "is whether the economic waste caused by the operation of the agency outweighs the benefits and convenience to the public."

The findings of the Commerce Commission fail to state sufficient facts to support the conclusion that the public convenience and necessity require appellees to continue to maintain an agency station at Allenville. The commission compared the gross revenue obtained by the railroad company from all sources at Allenville to the wages paid its local agent, but without any reference to the matter of public convenience and necessity. Where by far the largest percentage of the gross revenue received at the station, as here approximately 83 per cent, is contributed by a single company, a grain company whose shipping needs will be satisfied by the agency station at Sullivan, the mere fact that the gross revenue at Allenville exceeds the wages paid the station agent is not decisive. The Sullivan Grain Company's agent not only testified that the company did not require the services of an agency station at Allenville but preferred to bill its shipments at the agency station at Sullivan, less than six miles to the north. The total gross revenue derived from the general public, exclusive of the grain company, exceeded the wages paid the agent in the war year 1944, when revenue was abnormally high, by only $38.13. The wages of the agent in 1944, $2088.40, amounted to 98.26 per cent of the total revenue from busi-

ness handled for the general public at Allenville. Of the 364 carloads of freight received and forwarded at Allenville for the years 1942, 1943, 1944 and the first eleven months of 1945, 280 were handled for the grain company. In this connection, we must observe that the commission's order ignores the evidence with respect to the Sullivan Grain Company, its use of the agency station facilities at Allenville, and the high percentage of gross revenue allocable to the grain company's business. Arbitrary action of this character warrants a recurrence to our observation in *Fleming* v. *Commerce Com.* 388 Ill. 138, "A hearing before the commission is not a partisan hearing with the commission on one side arrayed against the utility on the other. It is an administrative investigation instituted for the purpose of ascertaining and making findings of fact."

The finding that the shipments, inbound and outbound, are of a diversified nature finds scant support in the evidence. Taking the year 1944 as illustrative, 22 inbound carloads were received at Allenville. Of these, 11 were carloads of road oil, 6 coal, 2 gravel, and 1, each, of limestone, cattle and phosphate. Of 88 carloads of outbound traffic shipped, 54 were cars of soy beans and 25 of corn, the remaining 9 being oats, corncobs and hay. Fifty-six less-than-carload shipments were received and 3 forwarded in 1944. A finding resting upon a more substantial basis in the evidence would have been that the gross revenue derived from the general public, excluding the single large source of revenue content to use the carrier's facilities at Sullivan, was barely sufficient to pay the wages of the station agent,—this, without considering the intangible loss by reason of stoppage of trains and the consequent delay in stopping for long-haul traffic,—and that the shipments, inbound and outbound, of the public at large were infrequent and not of a diversified nature. The commission might well have added that several of its own witnesses expressed

a preference for truck service, as against railroad and express company service.

The commission's assumption that the maintenance of an agency station is an absolute duty of a railroad company unless it can show, without question, it is operating the station at a loss is unwarranted. In ascertaining the extent of the use of the agency made by the public in past years to determine whether the public actually needs the present service and the cost of its maintenance is warranted, if the Sullivan Grain Company be considered a part of the general public, it appears that the portion of the public responsible for approximately eighty-three per cent of the gross revenue does not need the agency and has consented to its discontinuance. On the other hand, if the grain company be excluded, the revenue derived from the general public is insufficient to pay its reasonable part of the cost of maintaining the agency. The number of people accommodated is relatively small; the community and the public using the present facilities are but a short distance from nearby stations, and, in general, neither public convenience nor necessity requires the continued maintenance of an agency station at Allenville. Admittedly, the service at the prepay station, upon conversion of the agency station, will be curtailed slightly, but this prospective curtailment is not evidence of any real necessity on the part of the general public for the maintenance of the agency station. Under the circumstances described, the commission's order was properly set aside.

The order of the circuit court of Moultrie County is affirmed.

*Order affirmed.*