329 Mich. 432 (1951)
45 N.W.2d 520
CHICAGO & NORTH WESTERN RAILWAY COMPANY
v.
PUBLIC SERVICE COMMISSION.
Docket No. 50, Calendar No. 44,890.
Supreme Court of Michigan.
Decided January 8, 1951.
Bell & Davidson, Drennan J. Slater and Edward Warden, for plaintiff.
Stephen J. Roth, Attorney General, Edmund E. Shepherd, Solicitor General, and Charles M.A. Martin *435 and Albert J. Thorburn, Assistants Attorney General, for defendant.
BOYLES, J.
This is an appeal by the Chicago & North Western Railway Company from a decree in chancery entered in the circuit court of Ingham county affirming an order of the defendant Michigan public service commission and dismissing plaintiff's bill of complaint. The bill of complaint was filed as a statutory method[*] of review of certain proceedings before the defendant commission and to set aside and enjoin the enforcement of the order entered by the commission in pursuance thereof. The decree and the order which appellant now seeks to have reversed grants plaintiff permission to discontinue passenger trains 10 and 15 operating daily between Escanaba and Powers, Michigan, but denies plaintiff's request for leave to discontinue passenger trains 9 and 14 operating daily between Powers and Iron River. Michigan. Only that part of the order which denies appellant the right to discontinue trains 9 and 14 between Powers and Iron River is now involved in the appeal in this Court. Said trains, operating on a 1-a-day schedule between Powers and Iron River, consist of a steam locomotive, a baggage car and 1 passenger coach. The locale and distance of said operations are shown on the following map:
*436 
Appellant is a common carrier of goods and passengers by rail with operations extending throughout 9 States north and easterly from Wyoming, including Wisconsin and the Upper Peninsula of Michigan. In 1946, appellant was authorized by the defendant commission, in pursuance of general order No 47 (1945) of the (Federal) office of defense transportation to discontinue passenger trains Nos 10, 201, 202 and 11 between Escanaba and Iron River, provided plaintiff should substitute trains 9-14 and 10-15 between said points, such substitute trains to be operated for at least 6 months for the purpose of determining whether their operation would be profitable. Trains 10 and 15 were to run between Escanaba and Powers. Trains 9 and 14 were to run between Powers and Iron River. That substitution *437 was made and said trains were operated accordingly. Plaintiff kept a record of all direct revenues and direct movement expenses in connection with the substitute trains and found that a very substantial loss resulted from the operation of said trains. The loss for a period of approximately 9 1/2 months during 1946 was in excess of $40,000. However, appellant has continued to run said trains and the annual loss has increased since that time to about $80,000. Plaintiff's railroad between Escanaba and Iron River is paralleled to a great extent by highway US-2 upon which are operated various bus lines serving the communities from Escanaba to Iron River. Claiming that the operation of trains 9-14 and 10-15 was a waste of transportation, was not required for public convenience and necessity, and that unless plaintiff should be permitted to discontinue the trains it would be unjustly and unconstitutionally deprived of its property, appellant filed an application with the Michigan public service commission for authority to discontinue the operation of said trains. The commission conducted public hearings, evidence was submitted on behalf of plaintiff and certain interveners, and in January, 1950, the commission issued an order granting plaintiff permission to discontinue trains 10 and 15 between Escanaba and Powers, but denying plaintiff permission to discontinue trains 9 and 14 between Powers and Iron River. The instant bill of complaint was thereupon filed, to enjoin the enforcement of said order as to trains 9 and 14 between Powers and Iron River.
Northland-Greyhound Bus Lines Company maintains and operates 3 buses daily each way upon US-2, serving substantially the same communities as trains 9 and 14, and all cities and villages now served by said trains are served by Northland-Greyhound buses with the exception of Stager, having a population of 8 people, and Scott Lake, having *438 a population of 50 people. At the hearings before the commission no one from Hermansville, Waucedah, Vulcan, Quinnesec, Spread Eagle, Florence, Stager or Scott Lake, small communities on said railroad route, made any protest against the proposed discontinuance of trains 9 and 14. The Chicago, Milwaukee, St. Paul & Pacific Railroad operates 2 daily buses each way between Iron River and Iron Mountain, such buses connecting with Milwaukee Road trains at Iron Mountain. Also, the Iron Mountain-Kingsford Transit Lines operate 5 buses each way weekdays between Iron Mountain and Vulcan, and 2 buses each way on Sundays between Iron Mountain and Vulcan.
At the hearing before the circuit judge, no testimony was taken on behalf of the plaintiff, counsel stipulating that the testimony taken and exhibits received by the Michigan public service commission be admitted as part of the record. That evidence showed the out-of-pocket loss in operation of trains 9 and 14 for 3 test periods. These exhibits included only direct movement expenses, such as actual wages and vacation allowances paid the crews operating the trains, payroll taxes, fuel, water, lubricants and other train and engine supplies and repairs. Nothing was included for maintenance of right of way, yards or other similar facilities. For the first period, from February 18, 1946, to May 31, 1947, a total of 450 days, the revenue was $17,867, the expenses $95,459, leaving a net loss of $77,592, or an average loss per day of $172.20. The second test period, for 30 days, from June 8 to July 7, 1949, showed revenue of $1,789, out-of-pocket expenses $8,609, making net loss $6,820. On a 12-month basis, such figures would produce an annual loss of $81,840. The third test period, from August 1, to August 15, 1949, showed revenue of $801, expense $4,260, net loss $3,459. On this basis, the yearly loss *439 would be $83,016. Said evidence further showed that the total revenue derived from all sources in the operation of these trains was only about one half the wages of the employees required to operate the trains, and that the revenue from all sources on these trains fell annually over $2,000 short of paying for the coal consumed in operating the trains. There was no substantial disagreement before the commission as to the amount of appellant's losses resulting from the operation of the 2 trains in question. The evidence also showed that at one time mail was carried on these trains, but that the United States government cancelled its contract for carriage of mail on the trains because the revenue derived from the mail was insufficient to meet the wages of a mail clerk. It was further shown that gross receipts from express amount to $5 or $6 per day.
The extent of the use of said trains by passengers was also shown. During the first test period, the average number of passengers carried on said trains 9-14 and 10-15, both ways, was about 43 per day. Assuming one half of this number rode on the entire trip, instead of the trip between Escanaba and Powers, on each train there was an average of slightly over 20 each way. During the same period, total revenues were $15,529, approximately 79 cents per passenger. The period from June 8 to July 7, 1949, showed 3.3 passengers per train mile and the average revenue per passenger was 96 cents which, on a 2 1/2 cent coach fare, would mean that on the average each passenger traveled about 38 miles. Similarly, for the test period August 1 to August 15, 1949, the same lack of patronage appears, 3.7 passengers per train mile and the average revenue per passenger 95 cents, which would also indicate that each passenger traveled about 38 miles.
*440 On this appeal, appellant claims that the order of the defendant commission, affirmed by the decree from which this appeal is taken, is unreasonable and arbitrary and amounts to confiscation of appellant's property in violation of rights guaranteed by both Federal and State Constitutions. With some variance as to phraseology, counsel are in agreement as to the issue to be settled in this Court. We must determine whether public convenience and necessity requires a continuation of appellant's passenger service by trains 9 and 14 between Powers and Iron River, in view of the established facts showing the financial loss to appellant by the operation of said trains. The trial court, relying on the record made before the commission, concluded that appellant had established "that the carrier is sustaining a substantial loss on the operation and is transporting what relatively seems to be a small number of passengers," but concluded that appellant had not shown "the lack of convenience and necessity."
At the hearing before the commission, several intervenors testified to show the extent of use of these trains by the public. Their testimony did not disparage the above figures. Mainly, it consisted of references to the unclean condition of the passenger coach, and the lack of proper connections for interstate service through Wisconsin to and from Milwaukee and Chicago which would result from discontinuing trains 9 and 14. The defendant commission received exhibits and testimony to show that the appellant carried a heavy tonnage of iron ore, that the deficit in operating income from the passenger train service here in question was made up by the operating revenues derived from the carrying of freight and from all operations over appellant's entire system. The defendant commission, at the hearing in the circuit court, showed that in the year 1948, according to the annual report filed with the *441 commission by appellant, its total railroad operating revenues for Michigan were $5,862,822. Its expenses for the Michigan operation were reported to be $5,281,831, thus leaving a net operating revenue for 1948 of $580,991. However, appellant's annual report for the year 1949 showed total revenues to be $4,735,829 for 1949, and total expenses to be $4,887,382, a resulting loss deficit of $151,553 for that year.
In determining whether public convenience and necessity requires the continuation of the passenger service provided by said trains 9 and 14, consideration must be given to the requirement of the population of the cities, villages and territory served, as well as to the financial loss sustained by the appellant in operating said trains. Appellant's passenger trains 9 and 14 serve the following cities and villages, with populations and schedules as shown below:

 Read Mileage
 Down Read Up from
 TRAIN 9 City or Village Population TRAIN 14 Powers
 10:10 PM Powers, Michigan ........... 258 8:50 0
 10:18 Hermansville, Michigan ..... 1000 8:37 4.07
 10:31 Waucedah, Michigan ......... 35 8:25 12.03
 10:42 Vulcan, Michigan ........... 650 8:14 18.53
 10:46 Norway, Michigan ........... 3728 8:10 20.74
 10:53 Quinnesec, Michigan ........ 400 8:03 24.51
 11:01 Iron Mountain, Michigan .... 11080 7:55 28.78
 11:03 Antoine, Michigan .......... 0 7:50 29.83
 11:13 Spread Eagle, Wisconsin .... 350 7:40 35.39
 11:25 Florence, Wisconsin ........ 1358 7:31 41.62
 11:38 Stager, Michigan ........... 8 7:18 48.74
 11:59 Scott Lake, Michigan ....... 50 6:56 61.17
 12:06 AM Caspian, Michigan .......... 1797 6:49 65.42
 12:08 Stambaugh, Michigan ........ 2081 6:47 66.66
 12:10 Iron River, Michigan ....... 4416 6:45 AM 67.56

The line of said railroad between Escanaba, Powers and Iron River runs substantially parallel to a Federal and State highway known as US-2, which serves the above cities or villages of Powers, Hermansville, Waucedah, Vulcan, Norway, Quinnesec, Iron Mountain, Spread Eagle, Florence, Stambaugh, *442 Caspain and Iron River. The Northland-Greyhound Bus Lines Company maintains and operates daily buses over and upon said US-2, serving the following cities and villages in accordance with the following schedule:

 Read Down Read Up
 No No No Cities No No No
 1202 1204 1206 of Villages 1203 1205 1201
 1:15 AM 10:20 AM 1:45 PM Powers, Mich. ... 1:10 10:40 10:15
 1:23 10:28 1:53 Hermansville,
 Mich. ......... 12:57 10:29 10:04
 1:48 10:58 2:18 Vulcan, Mich .... 12:34 10:04 9:39
 1:53 10:58 2:23 Norway, Mich. ... 12:29 9:59 9:34
 2:03 11:07 2:32 Quinnesec. Mich. 12:20 9:50 9:25
 2:15 11:40 3:00 Iron Mountain,
 Mich. ......... 12:10 AM 9:40 9:15
 2:29 11:54 3:15 Spread Eagle,
 Wis. .......... 11:50 9:23 8:58
 2:39 12:04 PM 3:25 Florence, Wis. .. 11:40 9:13 8:48
 3:03 12:29 3:50 Crystal Falls.
 Mich. ......... 11:17 8:48 8:23
 3:30 12:55 4:20 Iron River, Mich. 10:50 PM 8:20 PM 7:55 AM

All the cities and villages served by trains 9 and 14 are also served by said Northland-Greyhound buses, with the exception of Stager and Scott Lake. With the elimination of trains 9 and 14, there would still be good railroad transportation at Powers furnished by the Chicago & North Western; at Iron Mountain, furnished by the Chicago, Milwaukee, St. Paul & Pacific; and at Iron River also furnished by the Milwaukee road through bus connections between Iron Mountain and Iron River. Powers is on the same Chicago & North Western main line which serves Chicago, Milwaukee, Green Bay and numerous other cities. There are at least 4 Chicago & North Western trains daily which serve Powers. Iron Mountain is served by 2 main-line Milwaukee trains each way daily, which also serve Chicago, Milwaukee, Green Bay and numerous other cities. Iron River gets the same service as Iron Mountain through the use of bus connections.
The case at bar is in the same class as Ann Arbor R. Co. v. Michigan Public Service Commission, 91 F Supp 668, which case we consider controls decision *443 here. In that case, as in the instant case, the Michigan public service commission had granted the application of the Ann Arbor Railroad Company for permission to discontinue that part of its single passenger train service between Toledo and Durand, but denied it permission to discontinue the same 1-train service between Durand and Frankfort. The railroad company applied to the United States district court for the eastern district of Michigan, southern division, for an injunction to restrain the Michigan public service commission from enforcing that part of its order requiring the railroad company to operate 1 train daily each way between Durand and Frankfort. The 3-judge tribunal, after hearing the matter, on July 6, 1950, granted the temporary injunction (91 F Supp 668). In a later opinion in the same case, handed down by the same court September 18, 1950, it reaffirmed and adopted its earlier findings of fact and conclusions of law, and entered a decree making the temporary injunction permanent. The facts in that case were quite similar to those in the instant case. The court said:
"The controversy having reached the judicial stage, the plaintiff is not obliged to take advantage of available State court remedies before pursuing available Federal remedies. Where relief is sought from an order of an administrative tribunal on the ground that it is repugnant to the United States Constitution, the plaintiff may immediately assert his rights in the Federal courts. * * * It (the defendant commission) may not, however, make regulations for the furnishing of services or facilities which are obviously unnecessary and which can serve no useful purpose. The fact that the plaintiff has earnings from freight and ferry service which might absorb the losses is immaterial. Where there is no public necessity present, an order compelling the plaintiff to operate its trains under the circumstances of this case and under the conditions set out *444 by the defendant commission, is arbitrary and unreasonable, and carries with it the confiscation of the plaintiff's property without compensation, and denies to the plaintiff the equal protection of the laws, in violation of the Constitution of the United States."
In Pennsylvania-Reading Seashore Lines v. Board of Public Utility Commissioners, 5 NJ 114 (74 A 2d 265), decided June 19, 1950, the supreme court of New Jersey, in a very similar case, vacated an order of the defendant board denying the plaintiff railroad company the right to discontinue railway service on one of its branch lines. In granting the right to discontinue such service, the court, after quoting from numerous decisions, said:
"There can be no doubt of the power of a State functioning through an administrative body to regulate the services and facilities of common carriers so that the public necessity and convenience will be accommodated, but that power is not unlimited; it is circumscribed by the provisions of the United States Constitution. Under the guise of regulation the property of a railroad may not be taken by requiring it to furnish services or facilities not reasonably necessary to serve the public. * * * We are thus constrained by the authorities to held that public convenience and necessity are the criteria against which any discontinuance is to be measured, regardless of whether there is partial or total discontinuance of a particular service. If the service sought to be withdrawn is not required by the public convenience and necessity, the railroad cannot be constitutionally required to render the same, regardless of whether the discontinuance be partial or entire. To so require, in either circumstance, would constitute an arbitrary and unreasonable taking of property for private purposes and without compensation a violation of the `due process' provisions of our State and Federal Constitutions."
*445 Then, referring to Chicago, B. & Q.R. Co. v. Railroad Commission of Wisconsin, 237 US 220, 226 (35 S Ct 560, 59 L ed 926), said court continued as follows:
"The court proceeded to test the adequacy and reasonableness of the local facilities by the standard established in Atlantic Coast Line R. Co. v. Wharton, 207 US 328, 335 (28 S Ct 121, 123, 52 L ed 230, 234 [1907]), in which it was said: `It [adequate and reasonable facilities] is a relative expression, and has to be considered as calling for such facilities as might be fairly demanded, regard being had, among other things, to the size of the place, the extent of the demand for transportation, the cost of furnishing the additional accommodations asked for, and to all other facts which would have a bearing upon the question of convenience and cost.' After considering these factors the court felt constrained to strike down the order and the State statute upon which it was based."
In Chicago, B. & Q.R. Co. v. Municipalities of Holdrege, 152 Neb 352 (41 NW2d 157), decided February 9, 1950, the supreme court of Nebraska, in reversing an order of the Nebraska State railway commission which had denied the railroad company the right to discontinue 2 trains between Holdrege and the State line, held (syllabus by court):
"Where some inconvenience would result to a small number of the public by discontinuance of the service of branch line of a railroad, but other services existent and prospective could handle all the business handled by the railroad with comparatively little extra trouble and additional expense to the public, and the evidence shows that loss in revenue by continuance of the service of passenger trains on a branch line overbalanced inconvenience to public from discontinuance thereof, it is unreasonable and arbitrary for the Nebraska State railway commission *446 to deny application for the railroad to discontinue such branch line service."
In Chicago, B. & Q.R. Co. v. Nebraska State Railway Commission, 152 Neb 367 (41 NW2d 165), also decided February 9, 1950, the supreme court of Nebraska, under like circumstances, reversed an order of the defendant State railway commission which had denied to plaintiff the right to discontinue service of 2 trains between Lincoln, Nebraska, and the State line. The court held (syllabus by court):
"On appeal to this court from an order of the Nebraska State railway commission, of which it has jurisdiction, the only question for determination is whether the order is arbitrary and unreasonable.
"A final order of the Nebraska State railway commission, denying a railroad company permission to discontinue motor passenger trains operated at a loss and for the operation of which no public need exists, is unreasonable and arbitrary."
In Fleming v. Commonwealth, ex rel. Clinchfield R. Co., 191 Va 288 (61 SE2d 1), decided September 6, 1950, the supreme court of appeals of Virginia, affirming an order of the State corporation commission granting the plaintiff the right to discontinue the operation of 2 passenger trains a distance of 277 miles, said:
"In considering these facts the State corporation commission granted the relief sought. It held that from a study of the figures on the passenger business it is shown that the passenger travel and revenues are steadily decreasing while the cost of operation is steadily increasing, and that there is not seen any probability of improvement in this condition.
"The commission also found that while there was some testimony that inconvenience will result to the communities along the line by the removal of these trains and that there may be some disruption of the *447 mail and express service, the evidence as a whole shows that there is a very small amount of express business carried on the trains. In conclusion the commission held that `While it must be accepted that to curtail passenger service will cause some inconvenience to the communities along the line of the railroad, nevertheless, conditions, circumstances and modes of travel have vastly changed during the period of this operation, and the railroad company should not be required to continue such service at the continual and increasing loss as here shown. * * *
"`It does not appear from the record that there is sufficient available passenger traffic, or the possibility of such traffic, to justify the continuance of daily and Sunday passenger service on the line of this railroad in Virginia.'
"In our opinion the finding of the commission is amply supported by uncontradicted evidence. * * *
"It is a matter of common knowledge that a revolutionary change has taken place in the field of passenger transportation. Travel by air, water, buses, and by privately owned automobiles has largely brought about the change. The railroads no longer have a monopoly on transporting passengers. * * * Public service commissions and courts cannot shut their eyes to the changed conditions when considering public convenience and necessity and adequate public service facilities and conveniences that are reasonable and just."
In Atlantic Coast Line R. Co. v. Public Service Commission of South Carolina, 77 F Supp 675, the district court, E.D. South Carolina, Columbia division, a 3-judge tribunal held (syllabi):
"An order of the South Carolina public service commission requiring the continued operation of 2 intrastate passenger trains at a substantial loss could not be sustained even if the railroad system as a whole was run at a profit.
*448 "The power of the public service commission of South Carolina to regulate the services and facilities of common carriers with reference to the security and accommodation of the public is not unlimited but is circumscribed by the Federal Constitution and the property of a carrier may not under the guise of such regulation be taken by requiring it to furnish services or facilities no longer reasonably necessary to serve the public. * * *
"Whether a carrier may discontinue the operation of 2 intrastate passenger trains must be determined in light of the character and population of the territory served, the public patronage or lack of it, the facilities remaining, the expenses of operation as compared with revenue from such trains and the operations of the carrier as a whole."
In Chicago, B. & Q.R. Co. v. Illinois Commerce Commission, 82 F Supp 368, a 3-judge tribunal held (syllabi):
"Evidence established that there was no public necessity for passenger trains ordered restored by the Illinois commerce commission between Illinois points because the communities involved had a system of improved highways with much motor vehicle transportation. Smith-Hurd Stats Ill, c 111 2/3, §§ 1 et seq., 49a, 79-83; USCA, Const Amend 14. * * *
"An interstate railroad could not be compelled to restore local passenger trains operated between local points in Illinois whose operation entailed substantial operating losses notwithstanding railroad's system-wide railroad earnings were sufficient to have absorbed the loss where there was no public necessity for the restoration of the trains. Smith-Hurd-Stats Ill, c 111 2/3, §§ 1 et seq., 49a, 79-83."
In Flint & Pere Marquette R. Co. v. Rich, 91 Mich 293, 296, this Court said:
*449 "The record leaves no doubt but that the interests of the petitioner and of the general public will be subserved by the abandonment of this portion of the road. Its abandonment will affect injuriously those only who live along this 12 miles of road. One branch of the petitioner's road passes through Zion and the other through Yale. Those living within 3 miles of these stations can still be accommodated, as well as though this part of the road were not abandoned. Only those, therefore, living along a strip about 6 miles in extent can be seriously injured by the abandonment. Evidently this piece of road must be maintained at a loss. The traffic over it does not, and never will, pay. Public necessity has demanded and obtained a change of route. * * *
"I am unable to see any justice or equity in requiring the petitioner to maintain this piece of road. It cannot, under the law, be compelled to run more than 1 train per day, and it is admitted that this would be of but little benefit to the inhabitants."
For a more complete summary of decisions concerning the right of a railroad company to discontinue a line or a branch road on the ground it is unprofitable, see 10 ALR2d 1121-1163.
Although some inconvenience may result to some of the public by the discontinuance of trains 9 and 14, other existing services reasonably provide means for such travel with comparatively little inconvenience and appellant should not be required to continue similar service at a comparatively great loss. Where substantial losses result from the operation, the test to be applied is whether such economic waste outweighs any public benefit or convenience. It was so held in Ann Arbor R. Co. v. Michigan Public Service Commission, supra.
The defendant argues that the circuit court, and ergo this Court on review, does not weigh the testimony in order to determine whether the finding of the commission is supported by the preponderance *450 thereof, but will allow the order to stand if substantial testimony is found supporting the conclusion of the commission. Counsel relies on City of Detroit v. Michigan Railroad Commission, 209 Mich 395 (PUR1920D 867), where the Court held that the conclusions of the Michigan railroad commission as to what return a public utility shall be entitled to earn and what items shall be considered in making up the sum total of invested capital must stand unless the court finds that the resultant rate is unconscionable and unlawful. But, in the same case, the Court held that in reviewing rates the Court has the power to determine whether the rates are confiscatory or unreasonable. And in Michigan Bell Telephone Co. v. Ingham Circuit Judge, 325 Mich 228, 234 (81 PUR NS 599), the Court said:
"A rate order which is confiscatory is an unreasonable order and cannot be sustained."
We conclude that appellant has met the burden of proof required by statute[**] in the instant case, showing by clear and satisfactory evidence that the order of the commission requiring appellant to continue the operation of trains 9 and 14 is unreasonable and confiscatory, and that the economic loss resulting from appellant's operation of trains 9 and 14 overbalances whatever convenience the public derives from these trains. In that respect, we are not in accord with the findings and conclusion of the trial court. We conclude that public convenience and necessity does not require a continuation of the train movements under consideration.
Another phase of the case requires consideration. After the submission of the case to the circuit court, but before the case had been decided, counsel for plaintiff asked leave to file an amendment to its bill *451 of complaint and to present evidence to show that if permission should be granted to discontinue trains 9 and 14 plaintiff would make arrangements with Northland-Greyhound Corporation to put on an additional passenger bus to operate between Powers and Iron River, making connections with plaintiff's interstate streamliner trains 209 and 214 south into Wisconsin. The trial court denied permission to file the proposed amendment.
Appellant alleges that the purpose of the proposed amendment and additional evidence was to show that the Northland-Greyhound Corporation, a common carrier of passengers by motor vehicle, would be willing to furnish additional bus passenger service between Powers and Iron River which would make connections with appellant's trains 209 and 214; that the appellant would guarantee the costs in connection with such bus operation and that such bus or buses would be operated for the plaintiff-appellant's account. And appellant now argues that the circuit judge erred in refusing to reopen the hearing, and in refusing to allow the amendment and take further proofs. While we feel it necessary to hold that the decision rested in the sound discretion of the trial court, it must be recognized that appellant's offer to remedy the possible resulting inadequacy of service at Powers if trains 9 and 14 be discontinued, should be given opportunity for an outlet. Some intervenors claimed that there was such a break between the bus schedules and appellant's time schedules of trains 209 and 214 interstate into and from Wisconsin that public convenience and necessity required a closer connection for interstate travel. While the testimony was meager as to the necessity for such travel connections interstate, counsel for appellant at the oral argument here admitted that public convenience might better be served by additional bus service. The daily number *452 of passengers using such connections was not shown. While the necessity for such service is not of such importance as to require continuation of trains 9 and 14 here involved, the way should be open for further consideration.
A decree may be entered in this Court granting appellant permission to discontinue the operation of trains 9 and 14 between Powers and Iron River, but without prejudice to further hearing and further consideration by the Michigan public service commission, if requested, as to whether public convenience would be served by additional bus passenger transportation facilities at Powers, particularly to connect with appellant's trains 209 and 214. No costs, a public question being involved.
REID, C.J., and NORTH, DETHMERS, BUTZEL, CARR, BUSHNELL, and SHARPE, JJ., concurred.
NOTES
[*] CL 1948, § 462.26 (Stat Ann § 22.45).
[**] CL 1948, § 462.26(e) (Stat Ann § 22.45[e]).