Commuters' Committee, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued March 18, 1952. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*Lois G. Forer,* for intervenor, The Commuters' Committee, appellant.

*Clarence M. Freedman,* Assistant Counsel, with him *John E. Fullerton,* Assistant Counsel and *Lloyd S. Benjamin,* Acting Counsel, for Pennsylvania Public Utility Commission, appellee.

*Lockwood W. Fogg, Jr.,* for Reading Company, intervening appellee.

OPINION BY RHODES, P. J., May 12, 1952:

This is an appeal from an order of the Pennsylvania Public Utility Commission granting Reading Company, a railroad corporation, the right to abandon all passenger service on its branch line extending from Hatboro, Montgomery County, to New Hope, Bucks County, a distance of nineteen miles. The order is expressly conditioned upon the substitution of bus service over public highways in the same general territory by Reading Transportation Company, a wholly owned subsidiary of Reading Company. The application of Reading Company to abandon passenger service on this line was filed with the Commission on April 26, 1951. Concurrently, Reading Transportation Company filed an application to provide transportation by motor bus in substitution for the railroad facilities to be abandoned; the applications were consolidated by the Commission for the purpose of hearing. A number of municipalities filed resolutions of protest with the Commission. Hearings were held before an examiner of the Commission at Doylestown on June 13, 1951, and August 30, 1951. A number of individuals who objected to the abandonment of the passenger service as proposed by Reading Company organized an unincorporated association entitled "The Commuters' Committee." Prior to the second hearing of August 30, 1951, the Commuters' Committee filed a protest with the Commission.

The Commission by its order of December 27, 1951, approved the application of Reading Company to abandon passenger service between Hatboro and New Hope conditioned upon the inauguration of bus transportation facilities and the continuance of express service by the transfer of carriage to freight train facilities as presently operated by Reading Company or to the bus facilities of Reading Transportation Company. The

Commuters' Committee, acting through counsel, appealed to this Court, and filed a petition for supersedeas pending determination of the appeal. Hearing on the rule for supersedeas was held on February 7, 1952, and on that day we made the rule absolute.

Reading Company, intervening appellee, has moved to quash the appeal on the ground that appellant, an unincorporated association composed of residents of the area between Hatboro and New Hope served by Reading Company, is not a proper party to the proceedings authorized to take an appeal, and is not affected by the proceedings before the Commission or by the order of the Commission. The right to appeal requires that an appellant be (1) a party to the proceedings, and (2) affected thereby. *Arsenal Board of Trade v. Pennsylvania Public Utility Commission,* 166 Pa. Superior Ct. 548, 552, 553, 72 A. 2d 612. It has been held that an unincorporated group is not a legal entity. *Grant v. Carpenters' District Council of Pittsburgh and Vicinity,* 322 Pa. 62, 185 A. 273. Although we recognize that an unincorporated association may prosecute an action in the name of individual members acting as trustees ad litem, and that an action may be prosecuted against it (*Hasinger v. New York Central Mutual Fire Insurance Co.,* 117 Pa. Superior Ct. 475, 178 A. 153; Rules 2152-2153 of Pennsylvania Rules of Civil Procedure), the question still arises whether appellant, apart from its members, is a proper party to appeal in the present proceedings. See *Pennsylvania Commercial Drivers Conference v. Pennsylvania Milk Control Commission,* 360 Pa. 477, 483, 62 A. 2d 9, 12. An individual using the service rendered by the utility and filing a formal protest with the Commission may very well have such an interest as would make him or her a person affected by the Commission's order. But no individual member of the Commuters'

Committee filed a protest with the Commission in any capacity, and the identity of those composing such Committee does not appear. Although there may be merit in intervening appellee's motion to quash, we shall not dispose of the appeal on this ground. Under the circumstances of this case, we shall make disposition of the appeal on its merits.

Our scope of review on appeal is the same whether the Commission's order is a certification of new service or permits abandonment of existing public service. In either event, we determine whether there is error of law or lack of evidence to support the finding, determination, or order of the Commission, or violation of constitutional rights. *Pittsburgh & Lake Erie Railroad Co. v. Pennsylvania Public Utility Commission,* 170 Pa. Superior Ct. 411, 415, 85 A. 2d 646.

The application of Reading Company was filed under section 202 of the Public Utility Law of May 28, 1937, P. L. 1053, Article II, as amended, 66 PS §1122, which provides in part as follows: "Upon approval of the commission, evidenced by its certificate of public convenience first had and obtained, and upon compliance with existing laws, and not otherwise, it shall be lawful: . . . (d) For any public utility to dissolve, or to abandon or surrender, in whole or in part, any service, right, power, franchise, or privilege: . . ." Section 203 of the Public Utility Law, 66 PS §1123, provides in part: "(a) . . . A certificate of public convenience shall be granted by order of the commission, only if and when the commission shall find or determine that the granting of such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public; and the commission, in granting such certificate, may impose such conditions as it may deem to be just and reasonable." Under these provisions of the Public Utility Law the Commission

is authorized to determine whether abandonment of service by a public utility is in the public interest. *West Penn Railways Company v. Pennsylvania Public Utility Commission,* 135 Pa. Superior Ct. 89, 95, 4 A. 2d 545. Reasonable conditions may be attached to a certificate of public convenience for abandonment. *Irwin Borough v. Pennsylvania Public Utility Commission,* 142 Pa. Superior Ct. 157, 160, 15 A. 2d 547.

The branch line on which Reading Company seeks to abandon passenger service extends from Hatboro to New Hope through a farming district, with a few small towns, having no significant industrial development. New Hope is the largest town with a population of 1,059. The existing service is presently rendered by a Deisel electric combination unit, which makes five round trips on week days between Hatboro and New Hope with two additional trips between Hatboro and Ivyland which is three miles from Hatboro. Three trips are made between Hatboro and New Hope on Saturdays, but there is no Sunday service. All passengers using the Hatboro-New Hope branch must change at Hatboro where there is regular electric train service to Philadelphia and other points. Reading Company is to continue to maintain the roadbed of the Hatboro-New Hope branch and operate a daily freight train thereon. Express shipments will be transferred to the freight service except certain small items which may be carried by the proposed bus service.

There are thirteen stations between Hatboro and New Hope. The proposed substitute bus route will parallel the railroad as closely as possible under existing highway conditions. The bus schedule will conform substantially with the present train schedule between Hatboro and New Hope, and connections will be made at Hatboro with the electric train service in the same manner as connections have been made. The

buses, making frequent stops, will pass through more populated areas thus affording transportation service to many who do not now have convenient train service. It appears that the bus trip between Hatboro and New Hope will consume only ten minutes more than that required by train between the same points. The Montessori School is one of the stations between Hatboro and New Hope. The proposed bus route would be about a mile and a half distant, but the record discloses that provision will be made for the buses to stop at Montessori School upon advance notice that five or more passengers require service at that point.

At the second hearing before the Commission about thirty individuals testified in opposition to the application of Reading Company. Several witnesses representing Montessori School objected to the abandonment of rail service and the substitution of bus service because of the distance of the proposed bus service from the school and the present railroad station. Some protesting witnesses were of the opinion that buses could not maintain their proposed schedules as the bus route was about seven miles longer than the rail line; but as to this there was evidence to the contrary. In considering these matters the Commission in its order said: "The record is devoid of evidence which would indicate that the proposed bus facilities would not adequately serve the areas involved with the exception of that tributary to Montessori Station; and counsel for the protestant repeatedly opposed cross-examination in this respect, pleading that the record contains no assurance that the bus service would be maintained or that the proposed schedules could be operated despite the fact that the application of Reading Transportation Company is an integral part of these proceedings; that the applicants desire that the approval of one be made contingent on the approval of the other,

and that, if and when approved, the bus operation and the schedules applicable thereto remain under the continued jurisdiction of this Commission."

The Reading Company at the hearings introduced evidence that its out-of-pocket cost of rendering passenger service between Hatboro and New Hope was $58,089.99, less total annual passenger service revenues of $14,789.96, or a net loss on this branch of $43,300.03 per year, or 77.45 cents per train mile. These net loss figures for the Hatboro-New Hope branch do not include maintenance of roadbed and signals, station expenses and other overhead charges. It was accordingly calculated that passenger service revenues amount to 26.45 cents per train mile (18.33 cents being from passenger fares); that wage costs were 47.69 cents per train mile; that with the maintenance and fuel costs of the rail motor cars there was a total operating expense of $1.039 per train mile. The resulting loss from operation is 77.45 cents per train mile. The ratio of such expenses to revenues would be 3.93 to 1.

The exhibit submitted in evidence by the intervening appellee disclosed an annual net loss on passenger service over the entire Reading system, which varied from $839,055, in 1945, to $10,473,826, in 1949. In 1950 the loss of the Reading Company on passenger service was $8,531,846. Revenues from freight service were sufficient to absorb the passenger deficits. In 1945 the net income of the entire Reading transportation system was $10,622,756; in 1949 the net income was $5,889,055; in 1950 the net income was $9,307,651. The rate of return after accrued depreciation on its investment in railroad property varied from 4.63 per cent in 1945 to 3.58 per cent in 1950. From the data supplied, the Commission pointed out that freight revenues of the entire system in 1950 increased 14.5 per cent over those in 1945, but that passenger revenue de-

creased 43 per cent and passenger train service (passengers, mail, express, etc.) decreased 31.5 per cent.

It is obvious that there has been a steady decline in the passenger traffic on the Hatboro-New Hope branch from 1947 to 1951. The passenger traffic manager of the Reading Company testified that from the survey made the total number of passengers on and off the Hatboro-New Hope trains at Hatboro on the average week day (Monday to Friday) declined from 381 in January, 1947, to 205 in January, 1951. In May, 1951, the average was 126. On an average Saturday in January, 1947, the total was 269; in January, 1951, the total was 80; in May, 1951, the total was 98. The majority of the users of the passenger train service on the Hatboro-New Hope branch are commuters making a round trip daily. Consequently, an average of 126 persons per day would represent about half that number of individuals using the five trains each day. A special traffic check of all trains on the Hatboro-New Hope branch from May 7th to May 11th, inclusive, 1951, showed that the overall average was 6.8 passengers per train as compared to 71 passengers per train throughout the entire Reading system. In many instances there were fewer passengers on the trains on this line than there were members of the crew of three.

Our Public Utility Law (section 202, 66 PS §1122) does not define in detail the circumstances or conditions under which the Commission may permit abandonment by a carrier of a portion of its service. We are of the opinion, however, that among the factors to be considered in determining the existence or nonexistence of public convenience and necessity in abandonment of service by a carrier are the following: (1) The extent of the carrier's loss on the particular branch or portion of the service, and the relation of that loss to the carrier's operation as a whole; (2) the use of the

service by the public and the prospects as to future use; (3) a balancing of the carrier's loss with the inconvenience and hardship to the public upon discontinuance of such service; (4) the availability and the adequacy of service to be substituted. *Chicago & N. W. Railway Co. v. Public Service Commission*, 329 Mich. 432, 45 N. W. 2d 520; *Illinois Central Railroad Co. v. Illinois Commerce Commission*, 410 Ill. 77, 101 N. E. 2d 588; *Chicago B. & Q. R. Co. v. Municipalities of Holdrege et al.*, 152 Neb. 352, 41 N. W. 2d 157; *Atlantic Coast Line R. Co. v. Public Service Commission of South Carolina*, 77 F. Supp. 675; Annotation, 10 A.L.R. 2d 1121-1163.

In arriving at an ultimate conclusion as to partial discontinuance of service, the entire system of the utility or carrier should be viewed as a unit. *Philadelphia v. Pennsylvania Public Utility Commission*, 164 Pa. Superior Ct. 96, 107, 63 A. 2d 391. The mere fact that a branch line fails to earn its estimated proportionate share is not sufficient to justify its abandonment; a test is whether the loss to the carrier is unreasonable under all the circumstances, having regard to the interests of the public as well as the utility. *Borough of Carlisle v. Public Service Commission*, 81 Pa. Superior Ct. 475, 481, 482; *Chesapeake & Ohio Railway Co. v. Public Service Commission of West Virginia*, 242 U. S. 603, 607, 608, 37 S. Ct. 234, 61 L. Ed. 520; *Alabama Public Service Commission v. Southern Railway Co.*, 341 U. S. 341, 347, 71 S. Ct. 762, 95 L. Ed. 1002.

The Commission by its order determined "that abandonment of passenger train service as proposed by the applicant, conditioned upon the institution of adequate transportation by motor bus in lieu thereof, is necessary or proper for the accommodation, convenience and safety of the public." The Commission rec-

ognized that a small number of the public may be adversely affected by the discontinuance of the rail motor car service between Hatboro and New Hope. In its order the Commission said: "It is obvious that some inconvenience will be imposed on a limited number of present patrons of the train service. On the other hand, the experience of the applicant in similar cases, as stated in the record, indicates that more persons will be adequately served by the substitute bus service by reason of its operation on highways contiguous to populated areas and the more frequent stops for the receipt and discharge of passengers."

The Commission in approving the application of Reading Company has provided that the certificate of public convenience evidencing such approval be conditional upon its subsidiary substituting adequate bus service. The Commission has of course jurisdiction over both carriers as to future rendition of public service by them.

The finding by the Commission that abandonment of the passenger train service and the substitution of bus service were in the public interest is amply supported by the record, and in view of the factors involved the Commission's finding was entirely within the area of administrative discretion. The statement by this Court in *Borough of Carlisle v. Public Service Commission,* supra, 81 Pa. Superior Ct. 475, 482, is applicable: "But the public support of a branch or line may be so utterly inadequate, irrespective of its effect on the rest of the system, and so lacking in prospects of ultimate betterment, as to justify the conclusion that the public necessity for it no longer exists and that its continued operation is not required for the convenience and accommodation of the public." We are aware that there may be cases where the public interest clearly outweighs any loss or hardship to the carrier, and

that in such case a finding that abandonment of such service by the carrier was in the public interest would not be sustainable. But in the present case the determination of the Commission is based on adequate facts disclosed in its order and supported by substantial evidence.

The special traffic check made by Reading Company may have been at a time when there was less than normal usage of its Hatboro-New Hope line, and its allocation of expenses and revenues to this branch may not have been as specific as might be desired. The carrier has the burden of showing operation at a loss as to any particular service, and its expense-revenue allocation must be reasonably accurate. But on the record before us any probable variation in the figures submitted could not affect the result—that this branch line carried comparatively few passengers at costs which, by any reasonable calculation, exceeded by several times the revenues received. Decreasing public patronage and the inauguration of adequate bus service between Hatboro and New Hope were also factors for the Commission's consideration in concluding whether the public interest and public necessity required the continuation of train service on this branch line. It is scarcely necessary to say that abandonment by a carrier of train service on a part of its system without substituted service may present a different problem than that which was before the Commission in this case.

Our order of February 7, 1952, making the appeal a supersedeas of the Commission's order of December 27, 1951, is revoked and terminated.

The order of the Commission is affirmed.