## WESTERN MARYLAND RAILWAY COMPANY

### v.

## THE PUBLIC SERVICE COMMISSION OF WEST VIRGINIA

### (No. 11018)

Submitted January 14, 1959. Decided February 24, 1959.

*Ernest K. James, Norman C. Melvin, Jr.,* for petitioner.

*T. D. Kauffelt,* for respondent.

GIVEN, PRESIDENT:

The petitioner, Western Maryland Railway Company, on March 5, 1958, filed its petition with the respondent, Public Service Commission of West Virginia, praying authority to discontinue the furnishing of passenger service over its branch system between Elkins, West Virginia and Durbin, West Virginia, a distance of approximately forty seven miles. After full hearing, respondent entered an order granting in part the relief prayed for, but ordered that petitioner continue the furnishing of such passenger service on Monday, Wednesday and Friday of each week. This Court granted a review of the action of respondent insofar as it related to the requirement of furnishing passenger service on Mondays, Wednesdays and Fridays.

Under the schedules in effect at the time of the filing of the original petition, petitioner was required to furnish passenger service between Elkins and Durbin, and approximately fifteen intermediate points, on each day of the week except Sunday. The service consisted of a single passenger coach attached to the rear of a freight train. Two trains are involved, No. 153, which was scheduled to leave Elkins at 6:30 P.M. and to arrive at Durbin at 8:55 P.M., and train No. 154, scheduled to leave Durbin at 9:25 P.M. and to arrive at Elkins at 11:55 P.M.

The evidence offered by petitioner is to the effect that the freight handled over its line between Elkins and Durbin consisted in large part of the moving of loaded freight cars received from the Chesapeake and Ohio Railway Company at the exchange point at Durbin and hauled through Elkins, and the return to Durbin of the empty freight cars. Under the former schedule petitioner was required to operate six round trips weekly between the two points, while under the schedule required by the order complained of it is required to operate one trip each way between those points on Monday, Wednesday and Friday of each week, notwithstanding the operation of freight trains for purposes of moving freight on

those days may not be economical or necessary. The evidence would appear to leave no doubt that the operation of such trains on those three days would necessarily require the operation of such trains on an average of two or three days each week, when not necessary or required for the purpose of moving freight. It appears clear that all the freight moved between the two points can be most conveniently and economically moved by trains operating three or four days each week, but that the days such trains must be operated are not the same each week, for the reason that the freight cars received by it at the exchange point at Durbin do not arrive at that point on definite schedule, or in trainload quantities. The question before the commission, therefore, as related to this review, was whether there existed an essential showing or justification for the requirement of the furnishing of such passenger service on the three days, or does there exist any necessity for, or does the public convenience demand, such passenger service on Mondays, Wednesdays and Fridays.

We think the evidence before the commission establishes, without any substantial dispute, that for the year 1957, as to the two trains involved, the average number of passengers per train day was 0.82, while the average number of passengers per train mile was 0.42. The passenger fare for the forty seven mile line was $1.69. The average monthly gross income from both trains for that year, the last year for which records were available, was approximately $40.00, and the gross income for the month of April, 1958, the last month for which records were available, was $26.37. According to the evidence of petitioner, its average loss per passenger was approximately $87.00. The passenger service on the line had continued a general decline for a number of years, and especially subsequent to the discontinuance of passenger service on the branch line of the Chesapeake and Ohio Railway system which terminated at Durbin. The passenger service required to be furnished by the two "mixed" trains here involved is the only passenger

service now furnished by the system of petitioner, all other passenger service having been discontinued, in accordance with authority of the several states through which such system extends. Though such system formerly afforded an extensive and excellent passenger service to the public, that service is now at the last "mile post". But common carriers are not required to furnish such service for sentimental reasons. They are entitled to reasonable profits.

Evidence was offered by protestants before the commission in opposition to the discontinuance of the passenger service, but it can not be said that such evidence actually contradicts the controlling facts set out above. At most, it brought into question the number of unnecessary or extra freight trains required to be operated by the order complained of, the actual amount of loss occasioned petitioner through the furnishing of passenger service, or that the use of such service by the public may have been slightly greater than that contended by petitioner, but the exact number of extra trains required, or the actual amount of such loss, or the exact number of passengers using the service, does not contradict the fact that the furnishing of the service results in a substantial loss to petitioner, or that no public necessity for the service exists. Though we need not here decide, we would probably be justified in inferring from the facts proved that such loss would be substantial, though no extra train be required and though freight trains be necessarily operated for efficient and economical freight service on Mondays, Wednesdays and Fridays. The cost of merely maintaining, attaching and moving the single passenger coach almost certainly exceeds substantially the gross amount of revenue received from such passenger service. The conclusions here stated are not actually in conflict with the finding of the Public Service Commission. It found: "1. Public convenience and necessity no longer require continuance of the daily, except Sunday, passenger service provided by applicant. 2. In view of the fact that under present conditions applicant must run the freight train over the line in ques-

tion three days a week, applicant should continue to provide passenger service on mixed Trains Nos. 153 and 154 on Monday, Wednesday and Friday of each week."

In proceedings for review of orders of the Public Service Commission, this Court does not weigh conflicting evidence; but where the evidence plainly establishes that the action of the commission is arbitrary in law, unreasonable or not supported by the evidence, or clearly unjust, this Court has jurisdiction, "in the interest of right and justice, [to] set aside and annul such order * * *". Part Point 3, Syllabus, *United Fuel Gas Company* v. *Public Service Commission,* 103 W. Va. 306, 138 S. E. 388. See *City of Charleston* v. *Public Service Commission,* 110 W. Va. 245, 159 S. E. 38; *Norfolk and Western Railway Company* v. *Public Service Commission,* 91 W. Va. 414, 113 S. E. 247; *Chesapeake and Ohio Railway Company* v. *Public Service Commission,* 78 W. Va. 667, 89 S. E. 844; *Brooks-Scanlon Company* v. *Railroad Commission of Louisiana,* 251 U. S. 396, 40 S. Ct. 183, 64 L. ed. 323.

In a case dealing with a controlling question herein, *Atlantic Coast Line Railway Co.* v. *Commonwealth ex rel. State Corporation Commission,* 191 Va. 241, 61 S. E. 2d 5, the Court said: "The Supreme Court of Illinois, dealing with a similar situation, in Illinois Central R. Co. v. Ill. Commerce Comm., 399 Ill. 67, 77 N. E. 2d 180, 183, said: 'The test to be applied,' we noted in the case last cited, (Illinois Cent. R. Co. v. Commerce Commission, 397 Ill. 399, 74 N. E. 2d 893, 894) 'is whether the economic waste caused by the operation of the agency outweighs the benefits and convenience to the public'.

"In Illinois Cent. R. Co. v. Illinois Commerce Commission, 397 Ill. 387, 74 N. E. 2d 526, 529, it is said: 'On this railroad there are eighty single agency stations, and the effect of the decision of the commission would be to require appellee to keep each of these stations operating with an agent, at a loss, if, as a whole, the utility makes a profit. When the statute refers to public convenience

and necessity it does not mean the one or more persons that may be benefited at a particular locality, but it means the public generally, and, in determining the true public convenience, the effect of the order upon the whole public instead of a small part of the public should be taken into consideration.' "

In *Thompson* v. *Illinois Commerce Commission,* 1 Ill. 2d 350, 115 N. E. 2d 622, it was held: "2. Best evidence as to whether there is a public necessity for continued operation of certain trains is extent to which public makes use of them." See *Southern Railway Co.* v. *Commonwealth of Virginia,* 196 Va. 1086, 86 S. E. 2d 839; *City of Princeton* v. *Public Service Commission,* 268 Wis. 542, 68 N. W. 2d 420.

Assuming, it is not established by proof, that all of the present users of the passenger service now furnished by the system would hereafter use the three day substituted service to the same extent as they now use the present service, there would still exist no basis for holding that the use would indicate a public need for the substituted service. The public use, though a few individuals would be inconvenienced, would be trivial measured against the minimum costs of furnishing such service. True, there may be instances where a common carrier may be required to furnish public service as to a definite branch or segment of its service, though a loss may thereby result to the carrier. We think, however, the principle has no application here, where there is a showing that no public necessity for the service exists, and that the loss has continued to increase year after year, and is substantial. See *Commuters' Committee* v. *Pennsylvania Public Utility Commission,* 170 Pa. Super. 596, 88 A. 2d 420; *Chicago, Burlington & Quincy Railroad Co.* v. *Illinois Commerce Commission,* 82 F. Supp. 368; *Chicago and Northwestern Railway Co.* v. *Michigan Public Service Commission,* 329 Mich. 432, 45 N. W. 2d 520; *Re Application of Central Railroad Company of New Jersey,* 43 N. J. Super. 13, 127 A. 2d 436; *Chicago, Burlington and Quincy Railroad Co.* v. *Municipalities of Holdrege,* 152 Neb. 352, 41 N. W. 2d 157.

The order of the Public Service Commission of West Virginia complained of, entered on the 28th day of July, 1958, will be set aside, insofar as it relates to the furnishing of passenger service on Trains Nos. 153 and 154 on Mondays, Wednesdays and Fridays, and the proceeding remanded to that commission.

*Reversed and remanded.*