(No. 29860.—

ILLINOIS CENTRAL RAILROAD COMPANY *et al.,* Appellees, *vs.* ILLINOIS COMMERCE COMMISSION, Appellant.

*Opinion filed March 19, 1947—Rehearing denied Sept. 15, 1947.*

GEORGE F. BARRETT, Attorney General, of Springfield, (WILLIAM C. WINES, RAYMOND S. SARNOW, JAMES C. MURRAY, all of Chicago, and W. F. GRAY, of Springfield, of counsel,) for appellant.

·WILLIAM J. O'BRIEN, JR., of Chicago, (VERNON W. FOSTER, CHARLES A. HELSELL, and JOSEPH H. WRIGHT, all of Chicago, and PARKER, BAUER & PARKER, of Effingham, of counsel,) for appellees.

Mr. CHIEF JUSTICE GUNN delivered the opinion of the court:

This case originated before the Illinois Commerce Commission by the petition of the Illinois Central Railroad Company and the Railway Express Agency, Inc., filed September 11, 1942, with the commission, requesting permission to withdraw the station agent at Watson, Effingham county, and to change such station from an agency station to a nonagency station in care of a caretaker. A hearing was held, and on February 17, 1943, an order was entered authorizing the discontinuance of the station as an agency station. This order retained jurisdiction for the purpose of entering further orders relating, in the opinion of the commission, to public convenience and necessity. A rehearing was granted on March 17, 1943. On January 22, 1946, the commission entered an order denying the petitioner's application to close and discontinue the agency station, and on February 5, 1946, a petition for rehearing on said order was denied. Upon review by the circuit court of Effingham county the order of the commissioners of January 22, 1946, was set aside. The commission appeals.

Such facts as are relevant to the opinion will be discussed hereafter in connection with the legal points determined herein. The principal grounds for reversal of the order of the circuit court of Effingham county are: (1) that under section 1 of an act to compel railroads to maintain depots (Ill. Rev. Stat. 1945, chap. 114, par. 48,) the railroad was required specifically to maintain a depot in Watson because it contained more than 200 inhabitants; and (2) that since the entire railroad system was operated at a profit no right existed to have an agency station dis-

continued merely because that station was operated at a loss.

The Public Utilities Act (Ill. Rev. Stat. 1945, chap. 111⅔, par. 8,) provides that the commission shall examine all public utilities and require compliance with the provisions of the act and with *any other law,* and with the orders of the commission, and, hence, it is claimed is required as a part of its duty to enforce the provisions of the statute on railroads and warehouses, and in particular paragraph 48 of chapter 114 above referred to. Paragraph 48 provides, "That all railroads * * * are hereby required to build and maintain depots for the comfort of passengers and for the protection of shippers of freight," in all towns or villages on their lines having a population of 200 or more. It is contended by appellant that as a matter of law this provision requires a depot and agency be maintained at Watson, because it contains a population of 300.

Watson is about six and one-half miles south of Effingham, and eight miles north of Edgewood, at both of which points station agents are in charge of stations, and from which points it is proposed to handle the business at Watson. These three towns are connected by a hard road. The trains operating through Watson were one passenger train south daily, and one southbound freight train running three times a week; one northbound passenger train daily, and one northbound freight train which stopped three times a week. The Greyhound Bus Lines operates daily through the village.

The amount of business transacted prior to 1943, in which the railroad participated, was: 1939, $6675; 1940, $3236; 1941, $2855; 1942 (9 months,) approximately $1800; out of which came the wages of the agent, averaging about $1600 per year. During this same period of time there was received yearly not more than 56 carloads of material, and approximately 700 items in less than

carload lots. There was shipped out each of these years approximately one carload of material. The evidence further discloses that during 1943, 1944, and a part of 1945, the same station was operated without maintaining an agent, through the aid of a caretaker, and during this period of time the average receipts of the station were about $4600 per year, and the caretaker's expenses $360.

It is contended that under the above facts, and because the village contained 300 people, it was mandatory to maintain an agency therein. This proposition involves the construction of said paragraph 48. Appellant claims that the words "build and maintain depots for the comfort of passengers and for the protection of shippers" implies and means they must necessarily have an agent, and not a mere caretaker, to comply with this law.

The law requires the building of a depot and the maintaining of a depot, and specifies the purpose for which it is required. There has not been called to our attention any decision directly construing the word "depot," as used in this act. The meaning must, therefore, be ascertained by the ordinary rules of statutory construction. The word "depot" has been frequently defined. Its general meaning is "A place of deposit for goods; a supply station; a storehouse; as, a coal depot in the Pacific." In a limited sense it means "A railroad station; a building for the accommodation and protection of railroad passengers or freight." (Webster's New Int. Dictionary, 2d ed.) The authorities from other States are in accord. In *State* v. *Edwards,* 109 Mo. 315, 19 S. W. 91, a depot was held to be a place of deposit for storing goods; and in *Hunter* v. *Norfolk and Western Railway,* 99 W. Va. 188, 128 S.E. 137, as a place where passengers get off and on the cars, and goods are loaded and unloaded. And substantially to the same effect is the case of *Chesapeake & Ohio Railway Co.* v. *Ricks,* 146 Va. 10, 135 S.E. 685, where it is held a depot is generally understood to be the place where a

carrier is accustomed to receive merchandise, deposit it, and keep it ready for transportation or delivery; and in *State* v. *New Haven & N. Co.* 37 Conn. 153, as applied to railroads a depot was held to be a place where passengers are received and deposited, and where freight is deposited for delivery. The latter case was approved in *Plunkett* v. *Minneapolis, Sault Ste. Marie & Atlantic Railway Co.* 79 Wis. 222, 48 N.W. 519.

It is contended, however, that, by the use of the word "maintain," the inference derived therefrom requires that an agency be maintained. The word "maintain" has a well-understood meaning, *viz.,* "to hold or keep in any particular state or condition, especially in a state of efficiency or validity; to support, sustain, or uphold; to keep up; not to suffer to fail or decline." (*Board of Education* v. *Board of Education,* 343 Ill. 464; Webster's New Int. Dict.) From this definition there is nothing that could be inferred which would require the establishment of an agency to sell tickets, make out waybills and perform the various functions of a station agent, which necessarily have no relation to the maintenance of a building. It would logically follow that by the requirements to maintain a depot it did not necessarily follow that this also required the maintenance of an agent to operate it.

Our attention is called to the case of *Public Utilities Com. ex rel. Beck* v. *Toledo, St. Louis and Western Railroad Co.* 267 Ill. 93. In that case no question of public convenience and necessity was involved, as in this case, but the only defense made by the railroad was that the village involved was unincorporated. The order was made under the law preceding the present Public Utilities Act, and did not require the railroad to have a telegraph operator or ticket agent. The case discloses there were two issues: (1) whether the village contained 200 inhabitants; and (2) as to whether it was incorporated. The point involved in the instant case, that an agent is a necessary

part of a depot, was not even discussed. After holding against the railroad company on these issues, the court said: "When these facts were disclosed it became the duty of the commission to require appellant to maintain a depot at Fancher *unless the result of such enforcement would be confiscatory.*"

In *Louisville and Nashville Railroad Co.* v. *Commerce Com. ex rel. Village of Belle Rive,* 353 Ill. 375, the commission denied a petition of the railroad company to operate a station in a village of 270 inhabitants as a nonagency station. That decision was reversed on the ground it was necessary for the commission to find facts to show why public convenience and necessity required the railroad should maintain an agency station in order to properly serve the public.

In *Illinois Central Railroad Co.* v. *Commerce Com.* 375 Ill. 585, we set forth the elements to be considered by the commission in cases involving substantially this question, and said: "The real question is, was it shown that the public good derived from the maintenance of the agency station overcame the loss in maintaining it as such? * * * It is not reasonable to require the maintenance of an agency station when the cost of such service is out of proportion to the revenue derived from that portion of the public benefited thereby, especially where a substitute service may be provided which will afford the same essential service but which is less convenient."

These are all cases involving the closing of an agency at a small railroad station. In the case of *Public Utilities Com.* v. *Toledo, St. Louis and Western Railroad Co.* 267 Ill. 93, the question of public convenience and necessity was not raised, and no question as to what was included in the word "depot" was discussed by the court. In the other cases no reference was made to the application of paragraph 48 of chapter 114. It seems to us that in view of what was said in *Louisville and Nashville Railroad*

*Co.* v. *Commerce Com.* 353 Ill. 375, and *Illinois Central Railroad Co.* v. *Commerce Com.* 375 Ill. 585, this question of discontinuing the agent at small stations must be considered in connection with public convenience and necessity.

It must be remembered that the appellee railroad company is not seeking to close the depot, or to not render good service in connection with the depot, but simply to render it in a less costly manner, as a nonagency station rather than as an agency station. We think there is nothing in the *Toledo, St. Louis and Western Railroad Co.* case which requires that an agency be maintained, but only a · depot, without an agent, unless this "would be confiscatory."

Discussing the Public Utilities Act in *Northern Trust Co.* v. *Chicago Railways Co.* 318 Ill. 402, we said: "Where the General Assembly enacts a new statute upon a certain subject and it appears from the act that it is the legislative intention to make a revision of the whole subject and to frame a new plan or scheme in relation thereto, there is, in effect, a legislative declaration that whatever is embraced in the new statute shall prevail and that whatever is excluded therefrom shall be discarded." We are of the opinion that the provisions of paragraph 48 of chapter 114 do not mandatorily require an agency station in villages that contain more than 200 inhabitants, but that the manner of operating railroad depots in such communities must be conformable with public convenience and necessity. *Illinois Central Railroad Co.* v. *Franklin Co.* 387 Ill. 301.

It is contended by appellant that before public convenience and necessity will authorize the closing of an agency of any size it must appear from the evidence the railroad as a whole is not showing a profit; or, to put it conversely, merely to show that the particular agency was operated at a loss does not authorize its being operated as a nonagency station, if the railroad as a whole shows a profit. The argument of the appellant on this proposition consists in

the main in showing that the formulae applied by the railroad companies in this kind of a case are inaccurate and misleading, and gives illustrations of how it might have such a result. We do not think the proper decision of this case depends necessarily upon the formulae. In *Public Utilities Com. v. Toledo, St. Louis and Western Railroad Co.* 267 Ill. 93, we said that the provisions of the law would be enforced "unless the result of such enforcement would be confiscatory."

In *Louisville and Nashville Railroad Co. v. Commerce Com.* 353 Ill. 375, we said the finding of the Commerce Commission must show why the railroad should maintain an agency station in order to properly serve public convenience and necessity. And in *Illinois Central Railroad Co. v. Commerce Com.,* 375 Ill. 585, we said that good business management dictates that economies should be effected wherever practicable, especially where there will be no substantial curtailment of services. In this same case the question raised by the railroad company was whether the cost of maintaining an agency at the station involved was so great as to amount to confiscation.

On this railroad there are eighty single agency stations, and the effect of the decision of the commission would be to require appellee to keep each of these stations operating with an agent, at a loss, if, as a whole, the utility makes a profit. When the statute refers to public convenience and necessity it does not mean the one or more persons that may be benefited at a particular locality, but it means the public generally, and, in determining the true public convenience, the effect of the order upon the whole public instead of a small part of the public should be taken into consideration. *West Suburban Transportation Co. v. Chicago and West Towns Railway Co.* 309 Ill. 87; *O'Keefe v. Chicago Railways Co.* 354 Ill. 645.

In the instant case the facts disclose that the cost of maintaining the agency amounts to substantially fifty per

cent of the gross income. The evidence shows without dispute the operating expenses of the railroad company together with taxes and other costs, excluding agent's compensation and investment return, amount to 77.06 per cent of the total revenue. Taxes on real estate are, of course, based upon a State-wide ratio, and wages of other employees are likewise the same throughout the system. It would therefore appear this percentage must be reasonably accurate. When this ratio is applied to the year 1941 we find that only $656 of the operating revenue of the station at Watson remains for the payment of help. For the year 1940 it would amount to $755. In no one year, including as late as 1945, would there be sufficient revenue left to operate the station on any other basis than that of employing a caretaker at $30 per month.

Under the holding of this court in *Illinois Central Railroad Co. v. Commerce Com.* 375 Ill. 585, this amounted to confiscation so far as the operation of this station is concerned, and since the railroad is made up of a large number of stations, the contention of the appellant that each of these nonprofit stations must be operated as an agency, regardless of the loss, would be contrary to the views we expressed in that case that "good business management dictates that economies should be effected wherever practicable."

The evidence further shows that the business done at this station was at least as much during the time when no agency was maintained as when an agency was maintained. In this connection one finding of the commission is rather misleading, and that is to the effect that during the seven-year period the proportion of the gross revenue accruing to the railroad was approximately 74 per cent, or in effect that the total revenue taken in was $33,348, and the total amount paid as agent's wages was $7427, so that the railroad received the difference of $24,690. This completely overlooks the admitted fact that the cost of

operation, excluding wages at the station, was 77 per cent of the gross, which would make the other expenses aggregate over $25,000, and leave an operation loss of several thousand dollars when the agent's salary was paid.

We think the decision of the Commerce Commission that the cost of operation of the single station cannot be considered unless its effect is to cause a loss to the whole system, is not comportable with the intention of the Public Utilities Act, nor with our recent decisions.

Some other questions have been argued by counsel, among which is the contention of appellee that the commission erred in granting a rehearing after first allowing the petition. We do not deem it essential to decide this point, nor do we examine the evidence in detail, because the propositions raised by the appellant are very largely questions of law. It is our opinion that the contentions of appellant are not well founded, and that since they go to the merits it is unnecessary to discuss the other points argued in the case.

The order of the circuit court of Effingham county is affirmed.

*Order affirmed.*