(No. 31946.—▮▮▮▮▮▮▮)

ILLINOIS CENTRAL RAILROAD COMPANY, Appellee, *vs.* ILLI-
NOIS COMMERCE COMMISSION, Appellant.

*Opinion filed September 21, 1951—Rehearing denied Nov. 19, 1951.*

IVAN A. ELLIOTT, Attorney General, of Springfield, (MILTON MALLIN, WILLIAM R. MING, JR., and JORDAN JAY HILLMAN, of counsel,) for appellant.

EVA L. MINOR, of Kankakee, and JOHN W. FOSTER, of Chicago, (J. H. WRIGHT, C. A. HELSELL, J. W. FREELS, and H. J. DEANY, of counsel,) for appellee.

Mr. JUSTICE CRAMPTON delivered the opinion of the court:

On January 23, 1950, the Illinois Central Railroad Company filed a petition with the Illinois Commerce Commission requesting permission to discontinue the operation of two passenger trains, No. 29 and No. 30, between Chicago and Carbondale. Extensive hearings were subsequently held, and on August 16, 1950, an order was entered denying the application. On September 13, 1950, a petition for rehearing on the order was also denied. Upon review by the circuit court of Kankakee County the order was set aside. From that judgment the commission appeals directly to this court, as authorized by section 69 of

the Public Utilities Act. (Ill. Rev. Stat. 1949, chap. 111⅔, par. 73.) The principal question presented is whether the order of the commission, finding that public convenience and necessity require the continued operation of these trains, is against the manifest weight of the evidence.

The Illinois Central Railroad is an interstate carrier of freight and passengers, operating in and through Illinois and other States. It also conducts a large amount of transportation business intrastate between points in Illinois. Its main line extends from Chicago through Carbondale, Illinois, and south through other States to New Orleans, Louisiana. In 1941 the trains operating north of Carbondale had become heavily loaded because of the movement of military personnel and the decrease in use of private automobiles incident to war restrictions. On August 17 of that year appellee installed passenger trains 29 and 30 between Chicago and Carbondale, in order to relieve its interstate passenger trains of this sharp increase in local traffic. After the end of the war military movements were reduced, a sharp decline occurred in express and overseas mail, and the general use of private automobiles was resumed. As a result railroad passenger traffic steadily decreased, especially on local trains such as 29 and 30. In addition, competition from other carriers added to the decline in the business of the Illinois Central. It accordingly decided to discontinue local trains 29 and 30, which its statistics showed to be very lightly traveled, and to adjust the schedules of its remaining trains in the territory so that the stations served by the removed trains would continue to receive substantially the same service.

Section 49a of the Public Utilities Act (Ill. Rev. Stat. 1949, chap. 111⅔, par. 49a,) prohibits public utilities from abandoning or discontinuing any service without first having secured the approval of the commission. The statute further ordains that a hearing must be afforded, at the conclusion of which the commission shall make and render

findings concerning the subject matter and facts inquired into and enter its order based thereon. (Ill. Rev. Stat. 1949, chap. 111⅔, par. 69.) The question whether a railroad may discontinue a particular service must be decided by the commission with reference to public convenience and necessity. *Illinois Central Railroad Co.* v. *Commerce Com.* 397 Ill. 387.

Both parties to the present cause agree that in determining the existence of public convenience and necessity three factors should be considered: (1) the cost of providing the service; (2) the use made by the public of the service; and (3) the availability and adequacy of other transportation facilities. As to the matter of cost, appellee maintains the passenger trains in question are being operated at a substantial loss, while the appellant urges they are operated at a profit. Evidence introduced by Illinois Central, which computed costs upon a fully distributed basis including prorata portions of enginehouse expense, items of depreciation, maintenance of way and structures, and other general expenses, showed deficits for the years 1947, 1948, and 1949 in the amounts of $140,017, $126,243, and $134,524, respectively. The commission, however, after eliminating from consideration all expenses other than so-called "out-of-pocket" costs—or "direct" expenses, such as wages, fuel, repairs, and so on, which were exclusively incurred in the traffic in question—found that a profit had been made of at least $137,244 for the year 1949 and similar results for the years 1947 and 1948.

On January 8, 1950, the operation of the trains had been temporarily discontinued, on orders of the Interstate and the Illinois Commerce commissions, because of the coal strike then in existence. They were restored to service on June 14, 1950, and appellee introduced evidence showing a daily deficit thereafter of about $800 per day which, even on the basis of the commission's expense figures, would result in a loss of over $400 per day. In its order

the commission expressly ignored this evidence, on the stated grounds that after the trains were restored they consisted of fewer cars, and that no public notice was given when the service was resumed. The evidence discloses that when the trains were restored to service the usual procdure was followed regarding notice: that a circular was issued to all agents, who, in turn, notify the public through telephone inquiries about train service. It further appeared, by affidavit attached to petition for rehearing, that notice of the return of the trains to service was in fact published in many newspapers of general circulation in the territory. As to the reduction in the number of cars, appellee maintains it was justified by the facts that traffic requirements were small; that in the regular operation of the trains it had always been the practice to use only as many coaches as the traffic required, and that the normal complement of coaches was only from one to three, depending upon the number of passengers using the service.

We think appellant was not warranted in refusing to consider the evidence as to losses occurring after the trains were restored to service. It is clear that the customary method of notifying the public of the service was followed. It is likewise apparent that the one coach provided was adequate to handle the 25 or 30 passengers carried per day, and that no purpose would be served by adding further coaches. We are also of the opinion that the action of the commission, in disregarding many ordinary items of expense in making its computation of cost, was arbitrary and unjust. In determining the true cost, all the outlays which pertain to the service in question should be considered. There is no basis for distinguishing in this respect between so-called "out-of-pocket" costs and other expenses which are nonetheless actually made because they are applicable to all the trains of the company instead of being exclusively incurred by the service in question. (*Mississippi Railroad Com.* v. *Mobile & Ohio Railroad*

*Co.* 244 U.S. 388, 61, L. ed. 1216; *Fleming* v. *Commerce Com.* 388 Ill. 138.) The cost, therefore, should properly include a just proportion of the expenses incurred for all facilities of which that in question forms a part.

Appellant argues that profits or losses in train abandonment cases should be determined on an out-of-pocket cost basis, rather than on the customary fully distributed basis, for the reason that if the trains are abandoned the common expenses remain substantially the same, and the burden of meeting them is transferred to the remaining services. But one of the important considerations in these cases is whether the particular service is an economic asset or an economic waste. Under the current system of public control of rates and service, the public, in a general sense, loses in cost what it gains in service. The true interests of the general public, therefore, are best served by the elimination of uneconomic services if that can be done without unduly impairing transportation facilities in the territory served. In deciding whether the service is an economic one in this sense, all costs attributable to it must be taken into consideration. The different question what, if any, savings could be effected by the particular applicant depends, of course, upon how much of that cost could be eliminated, and upon the extent to which it could retain the traffic presently handled by the trains in question. But the primary objectives to be attained in proceedings of this character include the avoidance of economic burdens upon the public as well as the maintenance of adequate transportation facilities, and the former cannot be properly attained if the total costs of the particular service are not considered. When this is done, the evidence in the case at bar discloses substantial losses in the operation of the trains.

The ultimate question of public convenience and necessity, however, cannot be determined by the existence of such losses, separately considered. It depends as well upon the public need for the service, as reflected by the use made

thereof and the availaibility and adequacy of other services. (See, *Alabama Public Service Com.* v. *Southern Railway Co.* 341 U.S. 341, 95 L. ed. 1002.) With respect to the use made of the trains the order of the commission contains the following finding: "during the last full month of operation of trains Nos. 29 and 30, December, 1949, the average number of revenue passengers carried daily on train No. 29 was 146.41 and on train No. 30 was 245.26." Appellee contends that these figures do not indicate a substantial use of the service, and that the adjustments since made on the schedules of other trains, to provide additional stops, are adequate to handle such traffic. The railroad also produced as witnesses members of the public, one of whom testified that on one occasion he rode on No. 29 and, as a matter of curiosity, walked through the passenger coaches to see the number of people on the train. He discovered that when the train arrived at Du Quoin there were only two other paying passengers aboard. Another witness, who resided near the railroad, testified that he had occasion to see the trains pass nearly every day and that they were very lightly loaded. Other evidence disclosed that since the trains were restored to service after their temporary discontinuance, No. 29 handled an average of only 25 passengers per day, and No. 30 had a daily average of only 31 passengers.

Testimony produced at the hearings showed that numerous civic and business organizations, public officials and representative members of the public had been advised of the hearings, and that the great majority of such interests had no objection to the proposed abandonment. Letters expressing approval of the discontinuance of the two trains and the adjustments in the schedules of other trains were received from various chambers of commerce in the territory, and the appellant in its brief recognizes the fact that in the larger communities there was little demand for the services of the trains in question.

The commission found that a discontinuance of the trains would substantially reduce the passenger service to certain smaller communities and would impair the mail service along the southern portion of the line. Its order recites that "while in certain instances under the proposed revisions of schedules, no inconvenience as to passenger service would result from the discontinuance of trains 29 and 30, in other instances communities which are presently served by trains 29 and 30 would be served by only one train per day in each direction and in some of these communities this one train would arrive either at an inconvenient time in the very early morning or would stop only upon flag notice so that this discontinuance of trains 29 and 30 would result in considerable inconvenience to the communities involved, particularly since no alternative public passenger transportation service appears to be available to many of these communities." The evidence discloses that trains 29 and 30 serve the following communities: Chicago, Harvey, Kankakee, Gilman, Onarga, Paxton, Rantoul, Champaign, Tolono, Tuscola, Arcola, Mattoon, Neoga, Effingham, Farina, Kinmundy, Centralia, Ashley, Du Quoin and Carbondale. It also appears that the Illinois Central operates daily, through the entire territory served by trains 29 and 30, five additional trains in each direction; that from Champaign to Chicago, the northern half of the territory, it maintains six trains daily in each direction; that from Gilman to Chicago, the northern quarter of the territory, it operates nine trains daily in each direction; that an additional train, operating every third day, serves the entire territory; and that each community served by trains 29 and 30 is also served by one or more of the other trains.

It is true, the communities of Farina and Neoga would have only a single passenger flag stop in either direction if trains 29 and 30 were discontinued, and at Tolono the single southbound stop would be at the hour of 12:13 A.M.

Examination of the record reveals, however, that during the month of December, 1949, train No. 30 took on only one passenger every two days at Farina, and discharged only one passenger every ten days at that station. At Neoga the average number of passengers getting on train 30 daily was only 1.77, and no passengers made use of train 29 at that place. Such negligible use of the trains at a few small communities can hardly warrant a finding that public necessity for the trains exists or that their removal would entail substantial public inconvenience.

One witness testified that trains 29 and 30 afforded a convenience to his business, in making Chicago connections with eastbound and westbound trains, and several other witnesses testified that their mail or express service would be delayed if the two trains were removed. But such isolated instances of inconvenience to some individuals hardly constitute the substantial evidence of public necessity required to justify the enforced maintenance of expensive railroad facilities. The convenience and necessity involved in public utility cases are those of the public and not of a few individuals. (*Illinois Central Railroad Co. v. Commerce Com.* 397 Ill. 323.) The evidence in the record before us manifestly fails to show any public necessity for these trains. Not only would appellee provide daily service to each of the communities by the revised schedules of its other trains, but the entire territory is also served by bus transportation paralleling the route of the Illinois Central. It is not disputed that every community now served by trains 29 and 30 would have a substitute daily mail service, and the minor delays at a few small communities, even if they are not eliminated by a rerouting of of the mail, are not of sufficient seriousness to warrant the order in question.

In determining questions of public convenience and necessity today, consideration must be given to the fact that railroads no longer have a monopoly of transportation.

Older decisions, requiring the continuance of particular passenger-train services even though conducted at a loss, were rendered in a period when railroads provided the principal source of land transportation. Horse-drawn vehicles provided little if any competition. Today, on the other hand, railroads are in competition with bus and truck lines as well as private automobiles traveling over a vast system of improved highways built, not by private capital as is the case with rail carriers, but by public expenditures. They are in competition also with government subsidized waterways and, in recent years, with the expanding activities of air lines. In the light of such changed conditions it is a duty of the carrier to seek, and of the regulatory agency to permit, elimination of uneconomic services no longer needed or used by the public to any substantial extent. The reasons which originally may have provided justification for compulsory facilities maintained at substantial losses have largely disappeared today, rendering local train service in many cases an obsolete form of transportation. Recognition of such factors by regulating bodies not only results in financial benefit to the railroads but, by eliminating unnecessary passenger-train service, makes possible more economical transportation for the public on the trains which remain in substantial demand.

We conclude that the order of the commission in the case at bar has no substantial foundation in the evidence. Under the manifest weight of that evidence, the economic waste involved in the operation of the two trains outweighs what small benefit and convenience they may afford to the public, and no substantial curtailment of services would be incurred by their removal. The circumstances presented in *Gardner* v. *Commerce Com.* 400 Ill. 123, upon which appellant relies, differ materially from the situation here. In that case the testimony showed that the loss in passenger traffic was caused by the irregularity of the service, the condition of the coaches, which were uncom-

fortable and unsanitary, and the fixing of inconvenient schedules of time; that no attempt was made to improve the service; and that the railroad instead promoted the operation of a bus line. We held that the loss of business by reason of inadequate and improper service could not afford justification for abandoning the passenger trains, and that the commission was warranted in denying the application. The facts in the case at bar do not show any such inadequate and improper service as the cause of the reduction in traffic, and our decision in the case cited can have no application.

Other contentions are made by appellee to sustain the judgment of the circuit court, but, in view of our conclusion, it is unnecessary to discuss them. The decision of the circuit court of Kankakee County is correct and its judgment will be affirmed accordingly.

*Judgment affirmed.*