( No. 29864.—

THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COM-
PANY *et al.*, Appellants, *vs.* ILLINOIS COMMERCE COM-
MISSION, Appellee.

*Opinion filed September 18, 1947.*

JAY H. MAGOON, of Lacon, and T. J. BARNETT, and FRANCIS J. STEINBRECHER, both of Chicago, (JONATHAN C. GIBSON, of Chicago, of counsel,) for appellants.

GEORGE F. BARRETT, Attorney General, of Springfield, (ARTHUR C. FORT, WILLIAM C. WINES, and RAYMOND S. SARNOW, all of Chicago, of counsel,) for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

The Atchison, Topeka and Santa Fe Railway Company and the Railway Express Agency, Inc., filed with the Illinois Commerce Commission on June 15, 1943, a petition seeking authority to change the agency station at Wilbern, Marshall county, to a prepay station. A hearing was held and, on October 6, 1943, the commission entered an order denying the petition. A rehearing was granted on November 16, 1943. A second hearing was held, and, on April 4, 1945, the commission entered an order denying the au-

thority sought by the railway company and the express agency. Upon appeal, the circuit court of Marshall county confirmed the order of the Commerce Commission. The railway company and express agency prosecute this direct appeal, conformably to section 69 of the Public Utilities Act. Ill. Rev. Stat. 1945, chap. 111⅔, par. 73.

By their petition, the Atchison, Topeka and Santa Fe Railway Company and the Railway Express Agency, Inc. alleged that the small volume of freight and passenger business at Wilbern, an unincorporated community of about fifty persons, can be properly and adequately handled by a prepay station; that public convenience and necessity no longer require the maintenance of the agency station at Wilbern; that, upon conversion of the agency station into a prepay station, the same stops will be made and passengers will pay the same rate of fare to conductors on the trains as is now paid to the agent; that the cost of conducting the business at the present station is grossly disproportionate to the amount of revenue derived therefrom and, also, to the benefit, if any, the public receives from the maintenance of the agency station; that substitution of a prepay station will effect a material saving in the net revenue of the two companies, without causing any real inconvenience to the public or interference with the duties and obligations the companies owe to the public, and that, to require them to continue such maintenance would be confiscatory and result in the taking of their property without due process of law and seriously affect their ability to discharge their duties as common carriers.

Wilbern contains a population of approximately fifty persons. Agency stations are maintained by the railway company 4.9 miles to the east, at LaRose, and 9 miles west, at Chillicothe, by rail. The distance by highways from Wilbern to LaRose is 6.7 miles and to Chillicothe, 18.8 miles. The only business establishments at Wilbern are one general store and a pipe line pumping station oper-

ated by the Sinclair Refining Company. There is a grade school but no church in the community. The inhabitants occupy thirteen houses within a half-mile radius of the station. The proposed plan to make Wilbern a prepay instead of an agency station will result in no reduction in the nuniber of freight and passenger trains serving its residents. The station house will continue standing to provide shelter for passengers during inclement weather and, in the winter, heat will be supplied.

For the six years commencing 1938 and including 1943, the gross revenue from all business handled at the Wilbern station varied from $3043 in 1939 to $18,992 in 1942. In 1941, total revenue amounted to $6589; in 1943, $16,106. The wages of the station agent during this period varied from $1659 in 1939 to $2088.32 in 1943. The substantial increases in gross revenue from 1941 through 1943 resulted almost entirely from large shipments of coal to the Sinclair Refining Company, operator of the pipe line pumping station at Wilbern. Station wages during 1942 for the railway system as a whole were 3.52 per cent of the total system revenue. At Wilbern, for the same year, station wages were 11.4 per cent of the total revenue accruing on station business. In 1941, station wages for the entire system were 4.28 per cent of the total system revenue. At Wilbern, for the year 1941, station wages were 29.57 per cent of the total revenue. In 1940, the discrepancies were even greater, the system percentage being 5.02 per cent and the station, 49.7 per cent. In this connection, particular mention must be made of the Sinclair Refining Company's use of the facilities at Wilbern. In 1940, the Wilbern station received no revenue from the oil company. In 1941, the total revenue from the station from all sources amounted, as recounted, to $6589. Of this, Sinclair traffic produced revenue of $4257.76. Excluding the revenue from the Sinclair company, station wages amounted to 76.15 per cent of the total revenue at Wilbern for the year 1941.

In 1942, the results were even more startling. Of the total revenue of $18,992, at Wilbern, Sinclair revenue amounted to $17,217.70, leaving but $1774.30 derived from all other traffic. For the year 1942, station wages at Wilbern amounted to $1916, or 107.94 per cent of the total revenue from business handled for the general public at Wilbern.

A breakdown of the 670 carloads of freight received at Wilbern from 1938 to February, 1944, inclusive, discloses that 562 carloads were delivered to the Sinclair Refining Company. In 1941, revenue from Sinclair traffic at Wilbern amounted to over 64 per cent of the total revenue from all sources. In 1942, Sinclair traffic produced over 90 per cent of Wilbern's gross revenue. In 1943, Sinclair revenue comprised over 73 per cent of the gross income and, for the first two months of 1944, it was over 86 per cent of the total receipts at Wilbern. The increase in coal shipments to the pipe line pumping station resulted from wartime regulations imposed during World War II, requiring the use of coal as fuel instead of gas or oil. With the lifting of these regulations, the revenue derived from the Sinclair company will very likely disappear completely. The Sinclair company acquiesces in the removal of the agent at Wilbern and proposes to have shipments of coal delivered to it at Wilbern through the agency stations at LaRose and Chillicothe.

Six witnesses testified in opposition to the removal of the agent. The first witness, a farmer, shipped livestock out of the station at Wilbern and, in his one year's residence, near Wilbern, "I have had only one carload of stuff shipped in." A second farmer testified that, from 1938 to 1942, inclusive, he shipped six carloads of hogs by rail from Wilbern, and that he would use trucks to ship his hogs if the Wilbern agent were removed. He testified, further, that about a year prior to the hearing he discovered a fire on the bridge east of Wilbern and notified the railroad agent at Wilbern about 9:30 P.M., and that the

agent extinguished the fire. The witness added he had heard that the railway's agent had discovered broken rails west of Wilbern fifteen or twenty years ago. The wife of the agent at Wilbern operates the general store and post office. She testified that if Wilbern were a prepay station, she would discontinue operation of the store because of the difficulty in receiving goods. The fourth witness, who testified that she ships a can of cream every other day from the station, stated that she would not have bought her farm had not Wilbern been an agency station. Another witness testified that from 1938 to 1943, inclusive, he shipped 800 pounds of wool and received about 400 or 500 rods of fencing from Wilbern but would make future shipments by truck if Wilbern were made a prepay station. This witness has a telephone and, like most of the witnesses, could call LaRose without paying a toll charge. The sixth witness testified that from 1938 to the spring of 1943, inclusive, he had received four cars of limestone and about two tons of hog feed through the station at Wilbern but that if Wilbern were a prepay station it would be inconvenient and unprofitable to use the railroad and he would haul the limestone from a nearby quarry in his farm truck.

The order of the commission is based upon findings, among others, that, on two different occasions, broken rails were reported to the agent at Wilbern station and necessary steps were taken to insure the safety of passenger and freight traffic; that, upon discovery of a fire at the bridge immediately east of the station, the railway company's agent was notified and put out the fire; that the Wilbern station is the only agency station maintained by the railway company in or nearby Wilbern; that toll charges are involved from Wilbern to Chillicothe and, for some patrons, from the vicinity north of Wilbern to LaRose; that the company received various undivulged sums at Wilbern for the years 1940 through February,

1944, for Western Union and express; that the railway company received $27 in 1943 for the lease of land at Wilbern station; that it received an undisclosed amount for delivery of United States mail by their trains at Wilbern; that the diversified nature of the shipments inbound and outbound shows the public is making a general use of Wilbern station; that the revenue accruing to the station for the period covered by the evidence shows a substantial increase; that the formula used by the railway company in showing the proportionate share Wilbern station should contribute in revenue relative to the entire system was arrived at arbitrarily, and that if the agent be removed no heat will be provided at the station house for passengers waiting for trains or to protect shipments of produce from freezing. In conclusion, the order found that, taking into account the safety of the traveling public on the railroad, the public welfare, public convenience and necessity, the duties of the agent at Wilbern station to the railway company and his services to the public, as well as the revenues and expenses assignable to the Wilbern station, the Commerce Commission would not be justified or warranted in permitting Wilbern station to be closed as an agency station.

The railway company and the express agency, hereafter referred to as appellants, contend that the Commerce Commission's order is invalid for the want of evidence and findings of fact to support its conclusion that public convenience and necessity require the continued maintenance of the agency station at Wilbern. Section 65 of the Public Utilities Act (Ill. Rev. Stat. 1945, chap. 111⅔, par. 69,) requires the commission, at the conclusion of a hearing upon any complaint, to make and render findings concerning the subject matter inquired into and to enter its order based thereon. The requirement is mandatory that the findings of fact upon the principal issues be sufficiently specific to enable an intelligent judicial review of the commission's decision and to ascertain whether the facts upon

which the order is predicated afford a reasonable basis for the order entered. (*Rockwell Lime Co.* v. *Commerce Com.* 373 Ill. 309; *City of Chicago* v. *Commerce Com.* 356 Ill. 501; *Peoples Fruit and Vegetable Shippers Ass'n* v. *Commerce Com.* 351 Ill. 329; *Chicago, Rock Island and Pacific Railway Co.* v. *Commerce Com.* 346 Ill. 412.) The purpose of judicial review of an order of the commission is to determine the reasonableness and lawfulness of the order. (*Chicago and Eastern Illinois Railway Co.* v. *Commerce Com.* 343 Ill. 117; *Central Northwest Business Men's Ass'n* v. *Commerce Com.* 337 Ill. 149.) The facts found may be re-examined, in connection with the evidence, to ascertain if they support the findings, but this court, to sustain the order, will not enter upon an independent investigation of the evidence to develop new facts not found by the commission. *Yowell* v. *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* 360 Ill. 272; *Louisville and Nashville Railroad Co.* v. *Commerce Com* 353 Ill. 375; *Kewanee and Galva Railway Co.* v. *Commerce Com.* 340 Ill. 266.

The findings of the appellee, the Illinois Commerce Commission, fail to state sufficient facts to support its conclusion that appellants should continue to maintain the station at Wilbern as an agency station. The firmly established rule is that it is unreasonable to require the maintenance of an agency station where the cost of such service is out of proportion to the revenue derived from the portion of the public benefited thereby, particularly where a substitute service may be provided which affords the same essential, although less convenient, service. (*Illinois Central Railroad Co.* v. *Illinois Commerce Com.* 375 Ill. 585.) Among the factors to be considered in determining the question are the volume of business done at the station, its proximity to other stations, the accessibility of the latter, and the cost of furnishing such service. (*Illinois Central Railroad Co.* v. *Illinois Commerce Com.* 375 Ill. 585.)

The convenience and necessity required to support an order of the commission are those of the public and not of the individual or a number of individuals. (*O'Keefe* v. *Chicago Railways Co.* 354 Ill. 645.) As we recently observed, "The maintaining of an uneconomic service resulting in an economic waste cannot be justified or excused by the showing that the service has been in the convenience and necessity of some individual." *Illinois Central Railroad Co.* v. *Illinois Commerce Com. ante,* p. 323.

Reference will be made to certain findings of fact in the challenged order of the commission. The finding that broken rails were reported to the agent at Wilbern station and that the necessary steps were taken to insure the safety of passenger and freight traffic rests entirely upon the hearsay testimony of a single witness to the effect he had heard about broken rails near Wilbern twenty years ago. The finding that the station agent was notified of a fire at the bridge and extinguished the fire ignores testimony that the fire could have been just as readily reported to the station agent at LaRose. Isolated instances of the character described furnish feeble support for the commission's order. The finding that Wilbern station is the only agency station maintained in or nearby Wilbern is true to the extent that this station is the only agency station in the community of Wilbern, but LaRose, only 4.9 miles distant by rail and 6.7 miles by highway, qualifies as being near Wilbern under modern conditions of travel. The finding that toll charges are involved for some patrons from the vicinity north of Wilbern to LaRose finds sole support in the testimony of a witness residing four and one-half miles northwest of Wilbern who said that he could not call Wilbern, LaRose or Chillicothe, without paying a telephone toll charge.

Seven findings relate to (1) the gross revenue of the railway received for various classifications listed; (2) wages paid to the station agent for the years 1940 through

February, 1944; (3) sums received by the railway for Western Union, express, lease of land at Wilbern station, and delivery of United States mail at Wilbern, and (4) the total number of carloads of freight received and shipped out for the same years. The evidence previously narrated discloses that the revenue derived from shipments to Sinclair Refining Company amounted to a substantial percentage of all revenue at Wilbern from all sources for the years 1941, 1942, 1943 and the first two months of 1944, the percentage ranging from 64 to 86 per cent. The largest shipper and the largest single source of revenue makes no objection, however, to converting the agency station into a prepay station. Revenue from the Western Union Telegraph Company has been so small it can well be ignored. The same observation applies to the sum of $27 received for the lease of railroad land. Just how this rental is dependent upon the agent's services is left to conjecture. The fact that railroad revenue, obviously small, is derived from transporting mail to and from a community of fifty persons can hardly furnish a legitimate basis for the maintenance of an agency station. The finding that the diversified nature of the shipments inbound and outbound demonstrates the public is making a general use of the Wilbern station does not find adequate support in the evidence. Shipments, inbound and outbound, are not of a diversified nature. The largest shipments were coal consigned to the Sinclair Refining Company. The further finding that the revenue accruing to the Wilbern station for the period covered by the evidence shows a substantial increase ignores the testimony that this increase was derived entirely from the increased use of the station by the Sinclair Company for carloads of coal received by it at Wilbern. A more realistic finding would have been that revenue accruing to Wilbern station will most likely decline substantially when shipments of coal to the Sinclair Company diminish or cease. The use of coal is temporary,

resulting from the shortage of oil during the war years. In 1940, the oil company received no coal at Wilbern station and the same situation will, no doubt, obtain again. Excluding the revenue from the Sinclair Company, the average annual revenue for the years 1941, 1942 and 1943 was $2780 on business from all other sources, in comparison with $3368 from all sources in 1940.

The finding that an arbitrary formula was used by the railway company in showing the proportionate share the Wilbern station should contribute in revenue relative to the entire system is not in harmony with recent decisions of this court. (*Illinois Central Railroad Co.* v. *Illinois Commerce Com.* 375 Ill. 585.) As in *Illinois Central Railroad Co.* v. *Illinois Commerce Com. ante,* p. 387, disposition of this case does not necessarily depend upon the use of a formula. Appellee's argument, that the financial condition of the railway company has been and is excellent, is beside the point. As we observed in *Illinois Central Railroad Co.* v. *Illinois Commerce Com. ante,* p. 323, "The financial condition of the entire system might well be taken into consideration as a factor to be considered in arriving at just where the balance lies in weighing the question of public convenience and necessity. * * * Assuming the financial structure of the entire system to be in a most favorable condition, this in itself would not justify the continuation of an economic waste occasioned by the retention of an agency station when not in the interest of public necessity and convenience."

The conclusion is inescapable that while the evidence adduced may show the agent at Wilbern serves public convenience, he does not serve public necessity. This court has held that an agency station is not required where the commercial development of the community was considerably greater than at Wilbern. (*Dixon* v. *Pitcairn,* 362 Ill. 213; *Chicago, Rock Island and Pacific Railway Co.* v. *Commerce Com.* 346 Ill. 412.) Assuredly, the earnings

of the station at Wilbern are insufficient to justify a full-time agency. Considering wages alone, the cost of handling the freight at Wilbern amounted to $3350 for the year 1940, $3552 for 1941, and $3832 for 1942. These figures are obtained from doubling the amount of wages paid the agent at Wilbern. This method of calculation is reasonable since every inbound shipment must receive the services of station employees at its origin, destination, or interchange points. Subtracting the amounts set forth from the gross revenue earned on the railway system freight at Wilbern, nothing was left to the railway company in 1940, $2653 in 1941 and $12,963 in 1942, to cover the cost of the actual transportation of the freight, maintenance of the property, interest charges, and the numerous items under the general designation of overhead expense incurred in operating the railroad. Other evidence shows that the cost of conducting business at Wilbern is disproportionate to the revenue obtained. Taking the best year, 1942, as illustrative, we observe that on the basis of a comparison of the earnings with the station expenses of all the railway stations, the wages paid at Wilbern, based on Wilbern revenue during 1942, would have been $296. Actual wages were $1916. Including the abnormal revenue obtained from the Sinclair Company, the station agent's wages were 29.57 per cent of the total railway earnings during 1941 and, in 1942, 11.4 per cent, or more than three times the system average of 3.52 per cent for the year.

We are of the opinion that the evidence discloses no real necessity on the part of the public for the maintenance of the agency station at Wilbern; that its maintenance is unsound economically, especially in view of the fact that the recipient of more than 92 per cent of all carload traffic at Wilbern from 1941 through February, 1944, is agreeable to the closing of the agency and, as previously observed, will 'soon, if not already, be receiving very little, if any, freight at either Wilbern or the neighboring station

at LaRose. The agent at Wilbern does not assist in the operation of the trains, nor is he necessary to the safety of the traveling public. A few patrons of the station will, no doubt, experience a slight inconvenience, but this factor is heavily outweighed by consideration of the exceedingly small volume of traffic, the meager revenue from the general public and the high cost of operation in relation to such revenue, and the availability of agency service at LaRose.

Appellants have satisfied the burden of showing continuance of the agency station at Wilbern would not be in the public convenience and necessity and are, therefore, entitled to curtail the services now rendered. Considering the findings of the Commerce Commission as a whole,— not each finding standing alone,—they do not afford a reasonable basis for the denial of authority to appellants to convert the agency station to a prepay station. An order of the Commerce Commission not based upon a substantial foundation in the evidence should be set aside. *Illinois Central Railroad Co. v. Illinois Commerce Com.* 359 Ill. 563.

Appellee maintains that, in any event, the order of the Commerce Commission finds sufficient support in section 22 of the Railroad and Warehouse Act, (Ill. Rev. Stat. 1945, chap. 114, par. 77,) which requires carriers to heat and light their stations and that, for this reason alone, the order of the circuit court is correct. Reliance is also placed upon section 8 of the Public Utilities Act, (Ill. Rev. Stat. 1945, chap. 111⅔, par. 8,) which directs the Commerce Commission to examine public utilities, keep informed as to their general condition and the manner in which their plants, equipment and other property are managed, conducted and operated, not only with respect to the adequacy, security and accommodation afforded by their service but, also, with respect to their compliance with "the provisions

of this Act and any other law, with the orders of the Commission and with the charter and franchise requirements.'' Section 22 of the Railroad and Warehouse Act provides that every railroad corporation in the State "shall at all junctions with other railroads, and at all depots where said railroad companies stop their trains regularly to receive and discharge passengers in *cities and villages,* for at least one-half hour before the arrival of, and one-half hour after the arrival of, any passenger train, cause their respective depots to be open for the reception of passengers; said depots to be kept well lighted and warmed for the space of time aforesaid.'' Appellee urges that the Public Utilities Act required the Commerce Commission to enforce section 22 of the Railroad and Warehouse Act. The General Assembly has vested the Illinois Commerce Commission with general supervision of all public utilities, (*Chicago, North Shore and Milwaukee Railroad Co.* v. *City of Chicago,* 331 Ill. 360,) including railroads. (Ill. Rev. Stat. 1945, chap. 111⅔, par. 10.) The statute creating the commission covered the entire subject of public utilities and is complete in itself. (*Northern Trust Co.* v. *Chicago Railways Co.* 318 Ill. 402.) Apart from the fact that Wilbern is an unincorporated community with a population of fifty persons, and is neither a city nor a village, within the contemplation of section 22 of the Railroad and Warehouse Act, section 22 does not mandatorily require the maintenance of an agency station. Nor does section 22 purport to require the services of an agent to heat and light a station. Moreover, the order of the Commerce Commission makes no reference to section 22, or any other provisions, of the Railroad and Warehouse Act. Indeed, the order does not warrant appellee's assumption that it was predicated in whole, or in part, upon this statute. The decisive test is whether the manner of operating railroad stations or depots in communities such as Wilbern con-

forms to and serves public convenience and necessity. *Illinois Central Railroad Co. v. Illinois Commerce Com. ante,* p. 387.

Upon the authority of *Illinois Central Railroad Co. v. Illinois Commerce Com. ante,* p. 323, and *Illinois Central Railroad Co. v. Illinois Commerce Com. ante,* p. 387, and for the reasons set forth in this opinion, the order of the circuit court of Marshall county is reversed and the cause remanded, with directions to further remand the cause to the Illinois Commerce Commission, with directions to enter an order granting appellants the relief sought by their petition.

*Reversed and remanded, with directions.*