Rydal-Meadowbrook Association, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued March 17, 1953. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, GUNTHER and WRIGHT, JJ.

*Daniel B. Michie, Jr.,* for appellant.

*Allen Lesley,* for Reading Company, intervenor, appellee.

*Clarence M. Freedman,* Assistant Counsel with him *John E. Fullerton,* Assistant Counsel, and *Lloyd S. Benjamin,* Counsel, for Pennsylvania Public Utility Commission.

OPINION BY RHODES, P. J., July 14, 1953:

This is an appeal from an order of the Pennsylvania Public Utility Commission granting Reading Company, a railroad corporation, the right to change the status of its suburban railroad passenger and freight station at Meadowbrook, Abington Township, Montgomery County, Pennsylvania, from an agency station to a prepaid or non-agency station.

The Company filed its application seeking such change with the Commission on June 9, 1951. Among those who filed protests were Rydal-Meadowbrook Civic Association, a non-profit corporation, the Order of Railroad Telegraphers, System Division No. 10, and a number of individual residents of the area. Commission hearings were held at which both applicant and protestants presented extensive evidence. The Association was represented by counsel before the Commission.

On September 22, 1952, the Commission by its order approved the application of the Company to change Meadowbrook station to a non-agency status. The Association, acting through counsel, appealed to this Court, and at the same time petitioned to have the appeal operate as a supersedeas. After hearing, the supersedeas was refused. The Company was granted leave to intervene as an appellee, and filed a motion to quash the appeal. The motion to quash and the merits of the appeal were argued at the same time.

The Company's motion to quash is based on the contention that the Association is not a qualified appellant. The right of appeal from an order of the Commission is limited to a party to the proceedings affected thereby. *Arsenal Board of Trade v. Pennsylvania Public Utility Commission*, 166 Pa. Superior Ct. 548, 552, 72 A. 2d 612; *Commuters' Committee v. Pennsylvania Public Utility Commission*, 170 Pa. Superior Ct. 596, 599, 88 A. 2d 420. As an appellant the Association is

in a position comparable to that of the Arsenal Board of Trade in the case above cited. It is true that the Association, acting through counsel, appeared before the Commission and participated in the proceedings, and that it exists as a legal entity in the form of a non-profit corporation. But the question remains, as in the *Arsenal Board of Trade* case, whether the Association, as a corporation apart from its individual members, had such interest in the proceedings as would make it a party "affected" by the order of the Commission. *Commuters' Committee v. Pennsylvania Public Utility Commission*, supra, 170 Pa. Superior Ct. 596, 599, 88 A. 2d 420.

As we have pointed out in our prior decisions, the party who may take an appeal as a proper party appellant in these cases is determined by well established rules. By adhering to these principles appeals may be taken by parties whose qualifications are not questionable. We are not at liberty to enlarge the field of qualified appellants beyond the established limits. It is plainly in the public interest, however, that users of the utility service be made formal parties to the record in all cases of this type involving questions of community welfare. In *Commuters' Committee v. Pennsylvania Public Utility Commission*, supra, 170 Pa. Superior Ct. 596, 599, 88 A. 2d 420, 422, we said: "An individual using the service rendered by the utility and filing a formal protest with the Commission may very well have such an interest as would make him or her a person affected by the Commission's order." There should be no difficulty in having at least one user of the utility service act as a protestant on the record before the Commission, and as an appellant, together with community organizations, so that appeals, which may be meritorious, will not have to be quashed hereafter for want of a qualified appellant. In the pres-

ent case, however, we shall dispose of the appeal on the merits, but this should not be construed as a precedent for any similar appeal where a qualified appellant may be lacking.

The location of Meadowbrook station is accurately described in the record. It is on the Philadelphia Division of the Company's New York Branch, 1.3 miles by rail, and 2 miles by improved highway west of its passenger and freight agency station at Bethayres, and about a mile east of the local station at Rydal. Inbound to Reading Terminal in Philadelphia the order of suburban stations in this vicinity is as follows: Bethayres, Meadowbrook, Rydal, Noble (1.8 miles by rail west of Meadowbrook), and Jenkintown.

The application of the Company was to remove the agent at Meadowbrook and to place this station under the jurisdiction of the agency station at Bethayres. Incoming and outbound freight at Meadowbrook in carload or L. C. L. lots would be handled by the agent at Bethayres. Shippers and consignees could continue use of freight service at Meadowbrook, the only difference being that shipments would be at the risk of the owner until picked up by the Company, and that all freight must be prepaid except as to users whose credit was established.

Evidence introduced by the Company in support of its application showed gross revenues, both freight and passenger, collected at Meadowbrook for the years 1948, 1949, 1950, and the first nine months of 1951. Virtually all the revenue received was derived from the sale of passenger tickets. The passenger revenues at this station were $9,493.95 in 1948, $9,610.78 in 1949, $8,194.78 in 1950, and $6,501.82 for the first nine months of 1951. Freight revenue accruing to the Company from this station was $65.38 in 1948, $17.55 in 1949, $50.36 in 1950, and $82.91 for the first nine months of 1951.

Twenty-six passenger trains presently stop at Meadowbrook each weekday, Monday to Friday, twenty trains on Saturday and thirteen on Sundays and holidays. The station agent at Meadowbrook was on duty Monday through Friday only, from 6:51 a.m. to 11:51 a.m., and from 12:51 p.m. to 3:51 p.m. The principal tickets sold were local one-way or round trip passenger tickets and commutation tickets. Under the application passengers boarding a train at Meadowbrook may pay their fares on the train without additional penalty, but multi-trip commuters' tickets must be purchased either at Reading Terminal or at agency stations nearby.

It is the Company's contention that it is in the public interest to reduce its large losses in passenger service by eliminating disproportionate expense wherever possible. In support of its application the Company read into the record its losses from operation of its passenger service, on its system as a whole, amounting to $8,510,729 for the year 1948, $10,473,826 for 1949, $7,531,846 for 1950, and $4,707,294 for the first six months of 1951. The Company's evidence showed the ratio of the expense of maintaining the Meadowbrook station (not including cost of transportation) to gross revenues received at this station, both freight and passenger. This ratio was 34.51 per cent for 1948, 35.40 per cent for 1949, 41.69 per cent for 1950, and 41.19 per cent for the first nine months of 1951. When transportation costs were included in the Company's computation, under I.C.C. allocation formulas, Meadowbrook station showed a deficit in net railway operations, freight and passenger combined, as follows: $620.26 for 1948, $1,055.92 for 1949, $1,143.92 for 1950, and $1,141.26 for the first nine months of 1951. The wages of the station agent, who was on duty about 254 days in the year and for only 60 per cent of the daily trains, amounted

to about $3,000 yearly, and the Company estimated the change of this station to non-agency status would effect a saving of approximately $3,700 annually. The station also contains the local post office. Under the application the waiting room will remain open and the freight shed and sidings will be continued in use.

Many protestants appeared and testified at the hearings before the Commission in opposition to the change of this station from an agency to a non-agency status. Several protestants stated they would be inconvenienced by having to purchase multi-trip commuters' tickets at Reading Terminal, where it was sometimes necessary to stand in line. A builder testified he had constructed forty houses in the vicinity and had plans to build one hundred and forty more, and that change in the status of the station would have an adverse effect on his business. The substance of protestants' testimony was that Meadowbrook area was a growing community, and entitled to the services of an agent at the station. On the other hand, the Company's passenger count showed only a 3 per cent increase in passenger traffic at this station during the 1948-1951 period, and the Company contended that if the community was growing residents were using vehicular and other forms of transportation. Protestants argue that recent commuter fare increases put in effect by the Company, if projected on the basis of past volume of traffic from this station, would more than overcome any alleged net loss on overall costs of service assignable to the station. The Company's calculations are to the contrary.

In its order the Commission, after reviewing the evidence of protestants as well as that of the Company, found: "While the service rendered by a station agent is desirable, we are not convinced from the record that the removal of the station agent from the Meadowbrook

station will result in more than occasional minor inconvenience to the railroad's patrons." Whether public interest and public necessity required the services of the station agent was for the Commission to determine under the facts. The Commission concluded that the proposed change in status was proper, and accordingly granted the Company a certificate to that effect.[1]

In *Commuters' Committee v. Pennsylvania Public Utility Commission,* supra, 170 Pa. Superior Ct. 596, 604, 88 A. 2d 420, 424, we set forth the factors to be taken into consideration where a utility seeks to abandon a portion of its passenger train service, as follows: "(1) The extent of the carrier's loss on the particular branch or portion of the service, and the relation of that loss to the carrier's operation as a whole; (2) the use of the service by the public and the prospects as to future use; (3) a balancing of the carrier's loss with the inconvenience and hardship to the public upon discontinuance of such service; (4) the availability and the adequacy of service to be substituted." The same considerations are not entirely applicable to the instant appeal. Each situation presents its own peculiar problem, and the solution is dependent upon variant facts and circumstances. Obviously, a change in status of a commuter's station from agency to non-agency involves curtailment of service to a lesser degree and in a different respect than abandonment or curtailment of train service on a rail line or a portion thereof. Where the carrier seeks to remove the agent from a station and reduce it to a non-agency status, the following factors should receive consideration: (1) The volume and the nature of the business transacted at the station; (2) proximity and accessibility of other stations;

---

[1] Section 202 of the Public Utility Law of May 28, 1937, P. L. 1053, as amended, 66 PS §1122 (d), and section 203 of the Public Utility Law, 66 PS §1123 (a).

(3) the ratio of cost of maintaining the station agency (including both out of pocket and overall expense) to revenues received from the station; (4) the inconvenience to the public resulting from removal of the agent; and (5) the nature of the service remaining or to be substituted. *Southern Ry. Co. v. Public Service Commission,* 195 S. C. 247, 10 S. E. 2d 769; *Atchison, T. & S. F. Ry. Co. v. State,* 190 Okla. 18, 119 P. 2d 840; *Atchison, T. & S. F. Ry. Co. v. Illinois Commerce Commission,* 397 Ill. 406, 74 N. E. 2d 885; *St. Louis-San Francisco R. Co. v. State,* 195 Okla. 41, 155 P. 2d 718; *Atlantic Coast Line R. Co. v. Commonwealth ex rel. State Corporation Commission,* 191 Va. 241, 61 S. E. 2d 5. The financial status of a carrier, if it appears relevant and material, may be considered, but ordinarily the favorable financial condition of the carrier would not enter into the determination of whether an agency station should be changed to a non-agency station. An important test in these cases is whether the cost of maintaining the agency is out of proportion to the benefit to and the convenience of the public as a whole. *Illinois Cent. R. Co. v. Illinois Commerce Commission,* 375 Ill. 585, 32 N. E. 2d 146; *Illinois Cent. R. Co. v. Illinois Commerce Commission,* 397 Ill. 323, 74 N. E. 2d 545.

The Company's evidence disclosed that the cost of maintaining Meadowbrook as an agency station was wholly disproportionate to the revenues received. While protestants' evidence showed the area to be a growing community, experience did not tend to establish any substantial growth demanding the services of an agent at this station.

The Commission's basic finding was that the occasional minor inconvenience to some of the patrons did not justify the cost to the Company of maintaining an agent at this station or demand such service. While

the order of the Commission might have contained more detailed findings, it did effectually dispose of the main issue before it. The findings and order were sufficiently definite to enable this Court to pass upon the questions raised on the appeal. Cf. *Alko Express Lines v. Pennsylvania Public Utility Commission,* 152 Pa. Superior Ct. 27, 35, 30 A. 2d 440; *Follmer Trucking Co. v. Pennsylvania Public Utility Commission,* 171 Pa. Superior Ct. 75, 90 A. 2d 294. Appeals involving more complicated issues naturally require more specific findings by the Commission.

It is argued that the removal of the agent at Meadowbrook constitutes a discrimination by the utility against users of its service at this point, which is forbidden under section 402 of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1172. There is prohibited only "any unreasonable difference as to service . . . between localities or . . . classes of service, . . ." Assuming this section applies to the present appeal, any difference in service resulting from removal of the agent at Meadowbrook has a reasonable basis in fact, as the order of the Commission indicates. "There may be discrimination between classes of consumers, provided it is not unreasonable and rests on a sound basis of fact": *United Natural Gas Co. v. Pennsylvania Public Utility Commission,* 153 Pa. Superior Ct. 252, 263, 33 A. 2d 752, 757. See *Philadelphia v. Pennsylvania Public Utility Commission,* 164 Pa. Superior Ct. 96, 107, 63 A. 2d 391.

The findings of the Commission on the basic issues before it are supported by substantial evidence in the record.

The order of the Commission is affirmed.