New York Central Railroad, Appellant, *v.*
Pennsylvania Public Utility
Commission.

Argued March 20, 1962. Before RHODES, P. J., ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ.

*Paul Silberblatt,* with him *Bell, Silberblatt & Swoope,* for appellant.

*S. Maxwell Flitter,* Assistant Counsel, with him *Joseph I. Lewis,* Chief Counsel, for Pennsylvania Public Utility Commission, appellee.

OPINION BY WATKINS, J., June 14, 1962:

This is an appeal from the order of the Public Utility Commission denying the application of The New York Central Railroad Company for approval of a change of status of its station at Lock Haven, Clinton County, Pennsylvania, from that of an agency freight

station to that of a non-agency carload only freight station. The original petition was filed on August 24, 1959 and after denial and a grant of a rehearing the final order was made on October 23, 1961.

We plainly set forth in *Pennsylvania Railroad Company v. Pennsylvania Public Utility Commission,* 197 Pa. Superior Ct. 382, 178 A. 2d 856 (1962), "The function of this Court on appeal, the factors to be considered and the law applicable to cases of this nature . . .".

The facts in the *Pennsylvania Railroad Company* case and in this case are quite similar. Again we have an effort by railroad management to reduce costs by the elimination of a certain alleged unnecessary freight agency without inconvenience to the public. The record shows that only carload and less-than-carload freight (L.C.L.), inbound and outbound, is handled at the Lock Haven station. No passenger, U. S. mail or parcel post is handled. The Pennsylvania Railroad Company has a station in Lock Haven, Pennsylvania, in which passenger service, U. S. mail and parcel post are handled.

Within a distance of approximately eleven miles the railroad has three agency freight stations. These are Mill Hall, Pennsylvania, approximately three miles west of Lock Haven, Pennsylvania; Lock Haven, Pennsylvania and Avis, Pennsylvania, approximately eight miles east of Lock Haven. The testimony discloses that the Clinton Delivery Service currently provides pick-up and delivery of L.C.L. freight and will continue to do so at no additional cost to consignee or consignor.

If the change were permitted, the railroad already provides pick-up and delivery service to the Lock Haven area. This will continue from the station at Avis at no additional cost. The Clinton Delivery Service will commence operation for the railroad station at Avis for L.C.L. freight shipments. As to carload lots the Avis agent will handle these shipments in the same

manner as now exists at the Lock Haven station. He will arrange for the spotting of cars on sidetracks already in use, so that carload shipments can be loaded and the train crews will continue to place carload shipments on sidetracks as is now done. There will be no curtailment of freight trains, and the trains that are now passing through Lock Haven will continue to do so, and the inbound and outbound carload freight shipments will continue to be handled as heretofore, with the exception that Avis will be the governing station instead of Lock Haven.

What counsel for the railroad said in its brief makes sense: "The Public Utility Commission is obviously completely unaware that, in this modern day and age, it is possible to transact business by telephone; that freight can be moved by large trucks using a modern highway; and that it is hardly an inconvenience to require a customer of the railroad to drive eight miles to Avis or three miles to Mill Hall to transact business or in the alternative use, at no additional cost to the customer, the modern convenience of a telephone and the facilities of Clinton Delivery Service. Perhaps, fifty (50) years ago, the public might have been inconvenienced, but certainly, not today."

On April 5, 1962, a message from the President of the United States relative to the transportation system of our Nation was delivered to the House of Representatives. This message is an important document and deserves the consideration of every transportation regulatory body. Among other things, the President said:

"But pressing problems are burdening our national transportation system, jeopardizing the progress and security on which we depend. A chaotic patchwork of inconsistent and often obsolete legislation and regulation has evolved from a history of specific actions addressed to specific problems of specific industries at specific times. This patchwork does not fully reflect

either the dramatic changes in technology of the past half century or the parallel changes in the structure of competition.

"The regulatory commissions are required to make thousands of detailed decisions based on out-of-date standards. The management of the various modes of transportation is subjected to excessive, cumbersome, and time-consuming regulatory supervision that shackles and distorts managerial initiative. Some parts of the transportation industry are restrained unnecessarily; others are promoted or taxed unevenly and inconsistently.

"Some carriers are required to provide, at a loss, services for which there is little demand. Some carriers are required to charge rates which are high in relation to cost in order to shelter competing carriers. Some carriers are prevented from making full use of their capacity by restrictions on freedom to solicit business or adjust rates. Restraints on cost-reducing rivalry in rate making often cause competition to take the form of cost-increasing rivalry—such as excessive promotion and traffic solicitation, or excessive frequency of service. Some carriers are subject to rate regulation on the transportation of particular commodities while other carriers, competing for the same traffic, are exempt. Some carriers benefit from public facilities provided for their use, while others do not; and of those enjoying the use of public facilities, some bear a large part of the cost, while others bear little or none."

The Commission criticizes the railroad for its presentation as to costs and profits, the railroad contending that their figures when applied to Lock Haven exclusively show that for every fifty cents of revenue derived at Lock Haven the cost to the railroad was one dollar, while the Commission contends that the station was operating at a profit and that the burden of proof to the contrary was not met by the railroad.

It is, however, self evident from the record that the closing of the Lock Haven station will save the railroad in excess of Six Thousand ($6000) Dollars per year.

The important factor in this case, regardless of the conflict as to the profit made at the Lock Haven station, is whether a saving can be effected without inconvenience to the public. Only one protestant appeared and he represented the "Order of the Railroad Telegraphers" and only one witness appeared, an employee of the Clinton Paper Company, which did not file a protest, to testify to inconvenience. There was no evidence of public inconvenience. A patron is not entitled to personalized service. Even the usual appearance of public bodies such as the City of Lock Haven and the Chamber of Commerce is absent in this case.

What we said in the *Pennsylvania Railroad Company* case, supra, at page 386, in regard to the Coalport agency is equally applicable to the Lock Haven agency in this case.

"It is apparent that the Coalport station itself does not return sufficient income to warrant the retention of an agent at the station and even though it would seem that the total revenue credited to the Coalport station would be sufficient to carry the burden of the agency, the railroad company should be permitted the economy of saving the expense of this agency station where, as indicated above, there are other readily available agency stations, and where the change from an agency station to a nonagency station will cause no inconvenience to the shippers using the facility, nor to the public in general.

"We must consider the plight of modern railroads which is so well set forth in Reading Co. v. Pennsylvania Public Utility Commission, supra, 194 Pa. Superior, at page 636, 169 A. 2d 587 and even if the income received would justify the salary of the agent, if the

expenditure is out of proportion to the benefit and the convenience of the public as a whole and its elimination can be accomplished without substantial inconvenience, as the record indicates, the railroad should be encouraged to abolish the agency and make the saving." See also: *Rydal-Meadowbrook Assn. v. Pa. P. U. C.*, 173 Pa. Superior Ct. 380, 98 A. 2d 481 (1953); *N. Y. Central RR. Co. v. Pa. P. U. C.*, 193 Pa. Superior Ct. 636, 166 A. 2d 55 (1960).

The order herein involved is so arbitrary, capricious and unreasonable as to amount to error of law and should be reversed.

Order reversed.

RHODES, P. J., and FLOOD, J., dissent.