## Delaware & Hudson Railroad Corporation, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued March 5, 1962; reargued March 19, 1962. Before RHODES, P. J., ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ.

*Robert M. Landis,* with him *Paul Bedford, S. K. Mitchell,* and *Bedford, Waller, Griffith, Darling & Mitchell,* and *Dechert, Price & Rhoads,* and *Donald D. Dart* and *John F. Reilly,* of the New York Bar, for appellant.

*S. Maxwell Flitter,* Assistant Counsel, with him *Joseph I. Lewis,* Chief Counsel, for Pennsylvania Public Utility Commission, appellee.

*John R. Lenahan,* with him *William J. Dempsey,* for intervenors, appellees.

OPINION BY WATKINS, J., June 14, 1962:

This is an appeal by The Delaware & Hudson Railroad Corporation from an order of the The Pennsylvania Public Utility Commission, rescinding its own order made November 14, 1960, in which the Commission had authorized the railroad to install automatic warning signals and gates at three grade crossings in the Borough of Olyphant, Lackawanna County, Pennsylvania, theretofore protected manually by a watchman in elevated towers on twenty-four hour duty, after rehearing, and directing the railroad to continue the manually operated gates at all the crossings.

On June 10, 1959, the railroad filed its application requesting authorization to install automatic flashing

light signals, short-arm gates, pedestrian sidewalk gates and bells at the South Valley Avenue, North Grant Street and North Valley Avenue grade crossings, on its right-of-way in Olyphant, Pennsylvania. Each of these crossings was then protected twenty-four hours a day by a watchman stationed in elevated towers who operated long-arm crossing gates from controls located in the towers. At the same time the railroad sought and was granted authorization to eliminate two of the three operating tracks at each of these crossings. The Borough of Olyphant and the School District of Olyphant, intervening appellees, appeared as protestants of this application.

On November 14, 1960, the Commission granted the prayer of the petition, holding that the automatic protection system was "necessary or proper to effectuate the prevention of accidents and promote the safety of the public" at the three crossings; and that the elimination of all but one track had removed many of the hazards that existed in 1953. It further found that the addition of sidewalk barriers, audible bells and flashing light signals "would increase the protection at all the crossings" and that a watchman confined to an elevated tower could "not offer the kind of protection the public deserves". A crossing watchman was to be provided by the railroad at South Valley Avenue crossing between the hours of 8 a.m. and 4 p.m., Mondays through Fridays.

The intervening appellees filed a petition for a rehearing and review on December 20, 1960, which was granted. On June 5, 1961, the Commission rescinded its order of November 14, 1960, and denied the railroad's application, stating that the record "appears to contain sufficient additional basic data" to warrant changing the findings and that it was "not convinced that the affirmance of our previous order will result in better protection to the public."

The railroad had been previously denied authority to make the suggested changes in 1953 and the record of that proceeding was incorporated by reference into the record of this case. At that time, all the tracks over the three crossings were operational, with freight train movements, including extensive switching operations and service to the facilities of the Hudson Coal Company located in the area. Since then the switching movements have been greatly reduced and a narrow gauge track which ran parallel with the railroad's tracks crossing East Grant Street and South Valley Avenue has been removed. This removal eliminated fifty train movements a day across South Valley Avenue and East Grant Street.

With passenger service discontinued traffic counts taken by the railroad in April, 1959, showed an average of 17 freight trains and one or two light engine movements in a twenty-four hour period over each of the crossings. This is a reduction of more than fifty per cent. of the train movements over the crossings at the time of the 1953 hearings. The same traffic counts show a twenty-four hour average of 8,719 motor vehicles and 1,015 pedestrians on South Valley Avenue; 1,034 motor vehicles and 347 pedestrians on East Grant Street; and 4,913 motor vehicles and 54 pedestrians at North Valley Avenue.

The railroad's evidence disclosed that it cost the railroad $64,000 to protect the three crossings with towermen on twenty-four hour duty, with $62,800 for salaries, and $1,200 for maintenance and operation. The cost of maintaining all the crossings with automatic protection would be $1,500 per year after an installation cost of $56,676.

The accident record with manually operated gates at the three crossings was, as follows, from 1915 to 1959: In 18 accidents at South Valley Avenue, 11 persons had been killed and 1 injured; in six accidents

at East Grant Street, 3 persons had been injured and none killed; and in six accidents at North Valley Avenue, 3 persons had been killed and 1 injured.

The railroad's own experience with automatic protection devices, similar to those proposed for use at these crossings, is that at 107 crossings in Pennsylvania and New York, where they have been installed, in the equivalent of 614 crossing years experience, total accidents had been reduced 81.6 per cent. Fatal accidents had been reduced 91.4 per cent, personal injury accidents had been reduced 86.5 per cent, and property damage accidents had been reduced 82.4 per cent.

The railroad's expert witnesses testified that the proposed automatic protection for these crossings was "unquestionably" safer than the manually operated gates, and that among their primary safety advantages were: increased visibility of the flashing signals; increased audibility of the bells; elimination of accidents caused by human failure; substitution of a short-arm gate which leaves the departure lane open, so that a vehicle cannot be trapped on the tracks between lowered gates; and increased awareness by the public of the warning devices because of their familiarity with highway traffic signals.

Protestants' evidence was largely confined to showing where most of the pedestrian traffic in the borough came from in relation to the crossings; and the location of schools, churches, playgrounds and business places in relation to the crossings. The Mayor, the President of Council, and the Chief of Police testified to the usefulness of the towerman in assisting the borough police in directing traffic, cindering the crossings and roadways and performing other functions for the borough. There was testimony that the watchmen sometimes gave aid to children and elderly people crossing the tracks. The witnesses for the protestants expressed their personal preference for manually guarded

crossings and their belief that watchmen are safer. They admitted, and it is apparent, that they knew little or nothing about the operation of automatic crossing signals and gates or were qualified to express an opinion as to the relative safety merits of either system.

It was on this record that the order of November 14, 1960 was made by the Commission, and there is no question that the order was amply supported by competent evidence. It is, therefore, necessary to carefully examine the testimony taken at the rehearing and find the "sufficient basic data" that caused the reversal of the Commission's order. The Commission recites it as follows:

"An examination of the testimony submitted at the rehearing reveals that traffic at the crossings, both motor vehicle and pedestrian, has increased sharply. Present employment conditions in the vicinity of the crossings have brought about this increase in travel. No testimony was offered by the applicant to refute this proof.

"The Burgess of Olyphant produced a police record revealing that these crossings were blocked for long periods due to railroad movements. Since the longest blocking of traffic continued for 20 minutes, a watchman at the crossing might have permitted necessary travel during such period of blocking.

"Two witnesses for the applicant testified that on November 21, 1960 the railroad corporation instituted its centralized traffic control. The witnesses testified that all operations are conducted on one track within the area covered by the three crossings and that if the Commission's order is affirmed the railroad corporation will remove the additional tracks at the three involved crossings so that there will be only one main track remaining. The witnesses testified that the crossing lengths at the three involved crossings will be reduced as follows: East Grant Street crossing, from 65

feet in length to approximately 30 feet; the South Valley Avenue crossing from 100 feet in length to 38 feet; and the North Valley Avenue crossing will be reduced from 240 feet to 140 feet in length.

"A witness for the railroad corporation testified that he is Signal and Communications Engineer and that if the order of the Commission is affirmed, in the instant proceeding, the automatic protection will be installed at the three involved crossings and that a member of the train crew can manually control the protection at the crossings."

And the Commission further says: "It is stated in the brief of the protestants, that considering the number of witnesses present at the hearing, there was an unmistakable expression of public opinion to which the Commission should give due consideration, that a utility must serve the public and the public has indicated the necessity of watchmen at these crossings. For these reasons, the protestants urge the Commission to reverse its order of November 14, 1960."

The railroad first contends that the Commission having issued its order authorizing the railroad to install automatic grade crossing signals committed an error of law in holding at the rehearing that the burden of proof remained with the petitioner to sustain the validity of the order. We agree with the Commission that it may rescind or amend any order made by it and that it properly held the railroad to its burden of proof. *Dept. of Highways v. Pa. P. U. C.,* 185 Pa. Superior Ct. 418, 138 A. 2d 143 (1958), where, however, President Judge Rhodes said at page 426, "Such amendment or rescission of its orders by the commission is, of course, subject to the requirement that there be adherence to the fundamental principles of fairness and to the constitutional guarantees of due process."

The Public Utility Commission is charged with power to prescribe the manner and conditions under

which grade crossings shall be protected, in order "to effectuate the prevention of accidents and the promotion of the safety of the public." Act of May 28, 1937, P. L. 1053, Art. IV, §409, as amended, 66 PS §1179(b).

And, of course, since the prior findings that the automatic equipment would best serve the safety of the public is clearly supported by competent evidence in the record, the real question in this case, taking the proceedings as a whole, is whether the action of rescission was inconsistent with the prior findings; was arbitrary, capricious, unreasonable and unfair; or was justified by substantial competent evidence in the record of the rehearing.

In the most recent case dealing with crossings, *N. Y. Central R. R. Co. v. Pa. P. U. C.*, 195 Pa. Superior Ct. 297, 171 A. 2d 635 (1961), this Court affirmed a decision by the Public Utility Commission that existing watchman protection best served the safety of the public because of the large number of train movements daily; the length of the crossing; and the excellent accident-free record at the crossings. The Court affirmed on the ground that the record supported the finding by competent evidence and that, "It is only in cases involving a manifest and flagrant abuse of discretion that courts are warranted in reversing the commission."

The instant case, however, is much weaker for the position of the commission than the *N. Y. Central R. R. Co.* case, supra. Here, the Commission had already decided that the petitioner had supported its burden of proof and the evidence on safety overwhelmingly supports its findings. At the rehearing there was no additional evidence as to the relative merits of either system as to safety. The evidence of the few times there were traffic tie-ups at the crossings occurred under the watchman system and the record shows that although it was true a watchman "might" alleviate the situation

by permitting necessary travel during the blockage, it was equally true a member of a train crew "might" do the same thing under automatic protection. The tie-ups testified to were certainly not serious enough to affect the ultimate decision in this case.

The population of the area has been steadily decreasing for the past twenty years and neither pedestrian nor motor traffic counts were introduced by the protestants. Even if it were admitted that motor traffic and pedestrian traffic did increase, in the face of the reduction of the number of trains passing over the tracks and the reduction of the number of tracks, so unlike the *N. Y. Central* case, supra, the crux of the decision must still be based on which system will better protect the safety of the public. The accident record at the crossings under the watchman system was bad, again unlike the *N. Y. Central* case where it was accident free, and the only expert testimony introduced supported the superiority of automatic devices as to safety. We can, therefore, come to only one conclusion, after a careful examination of the record of this rehearing, which is, that the Commission was moved to change its mind because of a parade of local witnesses expressing an opinion that they preferred the watchman system. Although, admittedly, uninformed about the safety factors of either system, and so not qualified to express an expert opinion, the testimony of these witnesses was the makeweight used by the Commission in holding that this "unmistakable expression of public opinion" must be given due consideration and in fact, under this record, must have been the decisive factor.

Most certainly a public utility must serve the public but crossing guards, whether human or mechanical, although a necessary form of service to the public, are required principally as a protection for the public. The controlling objective of the Public Utility Law in grade

crossings is the prevention of accidents and the promotion of safety. Public opinion, therefore, has no evidentiary value as to safety, unless informed and expert, as to the relative merits of the protection offered.

The record disclosed that a great saving could be made by the railroad in providing automatic crossing protection. However, it is clear, that unlike petitions for the reduction of services to save costs, where the Commission is under a duty to take into consideration the modern economic plight of railroads and permit the saving, if the reduction of service does not present a great public inconvenience, here, no saving could be permitted at any risk to the safety of the public.

But if the record clearly shows that the automatic equipment will not only save the railroad money but will better prevent accidents and promote the general safety of the public, then, the economic plight of railroads should be taken into consideration and the Commission should study the admonition of President Kennedy in his recent message to Congress on April 15, 1962, concerning regulatory bodies' determination of transportation problems, in which the President referred to "a chaotic patchwork of inconsistent . . . regulations" and said, "This patchwork does not fully reflect either the dramatic changes in technology of the past half century or the parallel changes in the structure of competition." *New York Central Railroad Company v. Pa. P. U. C.*, 198 Pa. Superior Ct. 458, 182 A. 2d 251 (1962) ; *Pa. Railroad Co. v. Pa. P. U. C.*, 197 Pa. Superior Ct. 382, 178 A. 2d 856 (1962) ; *Rydal-Meadowbrook Assn. v. Pa. P. U. C.*, 173 Pa. Superior Ct. 380, 98 A. 2d 481 (1953) ; *N. Y. Central R. R. Co. v. Pa. P. U. C.*, 193 Pa. Superior Ct. 636, 166 A. 2d 55 (1960).

As the writer of this opinion said in a dissent in the *N. Y. Central* case, supra, at page 303: "This is an example of action by the commission that is motivated

by the well meaning, sympathetic desire that moves all of us to save the jobs that will be destroyed by automation but it flies in the face of overwhelming testimony as to the efficacy of the automatic equipment and the savings that can be accomplished, and so becomes an arbitrary, capricious and unreasonable exercise of administrative discretion."

Evidence was entirely lacking in the rehearing to support the reversal of the order of November 14, 1960. The order was inconsistent with its own findings that the automatic system would increase protection at the crossings and that towerman protection did not offer the protection the public deserved. The final order was so arbitrary, capricious and unreasonable as to amount to an error of law.

Order reversed.

———

DISSENTING OPINION BY RHODES, P. J.:

I dissent in this case because I think the matter was within the administrative discretion of the commission. As said in *Progress Manufacturing Company, Inc., v. Unemployment Compensation Board of Review*, 406 Pa. 163, 167, 176 A. 2d 632, 634: "The appellate courts do not exist to re-try factual matters better left to determination by the administrative agencies charged with hearing the cases, and we should not begin to alter this approach now."

MONTGOMERY, J., joins in this dissent.